## SINGER v. UNITED STATES.
### No. 11806.

United States Court of Appeals
Sixth Circuit.
Nov. 30, 1953.

Edward N. Barnard, Detroit, Mich., for appellant.

George E. Woods, Asst. U. S. Atty., Detroit, Mich., Fred W. Kaess, U. S. Atty., Joseph C. Murphy, Asst. U. S. Atty., Detroit, Mich., on brief, for appellee.

Before SIMONS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

The appellant, hereinafter called Singer, attacks a conviction and sentence under two counts of an indictment charging him with conspiracy with Sol Kaye and others to violate 18 U.S.C. Section 659, "in that they would * * * possess 39,370 pounds of sheet steel of a value in excess of $100.00, stolen from the depot of the Brada Cartage Company, moving as part of an interstate shipment of freight * * *," in violation of 18 U.S.C. Section 371. Three overt acts are charged as having been committed by Singer December 10, 1950. Count 4 charges Singer and Kaye with the substantive offense of possession of the said steel on December 10, 1950, in violation of 18 U.S.C. Section 659.

A jury was waived. The District Court entered a judgment of conviction under both counts and sentenced Singer to two and one-half years imprisonment under each count, to run concurrently.

Sol Kaye, co-defendant with Singer, and Clifford Earl Stewart were inmates in the Milan Detention Farm, Milan, Michigan, prior to September 30, 1950. The two men became acquainted at Milan and after their release Kaye communicated with Stewart late in November, 1950. Kaye's story, which Stewart, in his testimony, corroborated on essential points, was that they met and discussed the possibility that Stewart could get a load of "hot" steel at Brada Cartage Company, for which he had formerly worked. On the same evening Stewart and Kaye went to the yard of the Brada Cartage Company on Central Avenue in Detroit and Stewart drove out a load of steel. He and Kaye drove the steel to a point near Ann Arbor, where they intended to "drop" the load. As they were preparing to unload the steel, a car drove up. Stewart, being told that a police officer was in the car, immediately returned the steel to Brada Cartage Company. The next day Kaye and Stewart had another talk about getting steel. Stewart went to the FBI that night and told the agent about his plans with Kaye. The FBI agent instructed Stewart to do whatever Kaye told him to. After this the FBI kept Kaye and Stewart under close surveillance, sending agents to observe their conferences and the transactions described below.

Singer, who operated three auto wash establishments in which he had a part interest, was an acquaintance of Kaye. About December 7th or 8th, 1950, Kaye went to Singer's place of business. Kaye

says that Singer asked him whether he could locate any steel, and that Kaye told Singer he knew a driver who could get "hot" steel. He then telephoned Stewart from Singer's office. The call was transferred to Petoskey, Michigan. Kaye says that the telephoning was done in Singer's presence but Singer denies this. After considerable delay Stewart called back on Singer's telephone, and Kaye asked him to come to Detroit at once, saying that he had a place where he could dispose of steel. Singer on the same day arranged with Morris Werney of Atlas Barrel & Cooperage Company, hereinafter called Atlas, that Werney would take a load of steel over the weekend, Werney arranging to unload the steel.

Kaye testified that Singer stated he would take care of Kaye when he sold the steel. As the steel was to be dropped at Atlas, Kaye drove Stewart to the Atlas premises in order to show him where the "drop" would be.

Sunday, December 10th, at about 3:30 a. m. Stewart, Kaye and Kaye's wife drove together to Brada Cartage Company. Stewart climbed over the fence around the Brada yard, drove out a load of steel and took it to Atlas, Kaye and his wife following the truck. At about 4:00 a. m. Singer drove to Atlas, meeting Stewart and the truck. He immediately called Werney to arrange for the unloading. Stewart says that Singer mounted the truck and instructed Stewart to remove the tags from the steel, directing him to destroy the tags, which were mutilated by Singer and Stewart. Singer then left the premises, drove to Woodward Avenue where he saw Kaye, and was arrested.

Singer admits that Kaye on Friday, December 8th, stopped at his place of business and that Singer talked with him about getting steel for resale. However, he disputes Kaye's testimony in certain important points. He says that Kaye suggested the steel transaction and categorically denies that there was any talk between himself and Kaye about "hot" steel. Schultz, however, a witness friendly to Singer, states that Singer suggested the transaction to Kaye. Singer admits calling Werney immediately and arranging for Werney to take the load of steel. He gives no account of Kaye's telephoning to Stewart in his office and states that the call was not made in his presence. A toll slip introduced in evidence shows that the arrangements for Kaye's telephone call to Stewart were made from Singer's office, consumed over an hour, and involved a transfer from Detroit to Petoskey, at which place the operator tried to reach Stewart at two numbers. The cost of the telephone call was $1.40. Singer, who had previously pleaded guilty to a charge of receiving stolen tires and of conspiracy with others to steal such tires, explains his trip to the Atlas yard at 4:00 a. m. on the ground that he was making a contract for legitimate sale of a load of steel in which he expected to make a profit; that he understood that the steel was coming from Pennsylvania and that it arrived at such an unusual hour because of a breakdown of the truck. He denies climbing on the truck and telling Stewart to destroy the tags, and asserts that he had no knowledge or suspicion that the steel was stolen.

At the close of the Government's case Singer moved for a finding in his favor on the ground (1) that there was no proof that the steel was stolen; and (2) that Singer never had possession of the steel. The District Court denied the motion.

■■■ As to the conspiracy charge, Singer's contention plainly has no merit. The interstate character of the shipment was stipulated. Substantial evidence was presented from which the District Court found that Kaye and Singer planned to steal a load of steel through Stewart. It is uncontradicted that neither Kaye nor Singer knew of Stewart's contact with the FBI. The court evidently believed Kaye's testimony, corroborated by Schultz, that Singer suggested the unlawful combination by an inquiry whether Kaye could locate any steel, and also that Singer and Kaye

planned to get "hot" steel. The District Court evidently considered that Kaye planned with Singer to steal the load through Stewart, telephoning Stewart in Singer's presence. The scheme was that the larceny should be effected by the agency of Stewart. But the District Court considered that an illegal combination to this end was made by Kaye and Singer and this court will not disturb the findings of the trial court made upon conflicting oral evidence. Cannon v. United States, 5 Cir., 166 F.2d 85. Since the combination was found to exist it follows that the directing influence in the conspiracy was that of Kaye and Singer. For Kaye directed Stewart in the operation and Kaye's acts in pursuance of the conspiracy in contemplation of law were the acts of Singer. Boyd v. United States, 142 U.S. 450, 455, 12 S. Ct. 292, 35 L.Ed. 1077. The overt acts which under Federal law must be proved in conspiracy cases, Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23, were charged and established.

The overt act necessary to be proved in such cases is an act to effect the object of the conspiracy. Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975. Telephoning Werney in furtherance of Singer's agreement with Kaye to violate the statute constituted such an overt act. Smith v. United States, 9 Cir., 92 F.2d 460. The entry of the Atlas premises by Singer twice on the morning of December 10th just before he took charge of the load of steel had a direct connection with and was in pursuit of the crime charged.

The conspiracy is complete on the forming of the criminal agreement and the performance of at least one overt act in furtherance thereof. Pinkerton v. United States, 5 Cir., 151 F.2d 499, affirmed 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489. United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, holds that an agreement or confederation to commit a crime is punishable as a conspiracy if any overt act is taken in pursuit of it regardless of whether the contemplated crime is consummated.

The fact that the arrangements miscarried because Stewart had revealed the plan to the FBI is immaterial. United States v. Bayer, supra; Lewis v. United States, 6 Cir., 11 F.2d 745.

The contention as to the second count likewise has no merit. In any case the judgment could not be reversed because the sentences on the two counts were made to run concurrently and Count 3 supports the judgment, Razete v. United States, 6 Cir., 199 F.2d 44, regardless of the attack upon Count 4. However, we think that Singer had possession of the steel. The truck was delivered to the place designated by Singer, he mounted it and took constructive possession of the property, directing the driver to remove the tags. Cf. Le Fanti v. United States, 3 Cir., 259 F. 460, 463.

Counsel for Singer in the court below urged that this was a case of entrapment but clearly this contention has no merit. The FBI did not suggest to Kaye and Singer that they should commit a crime. There is no testimony to the effect that the criminal design originated with the government officials and that Singer was an innocent person in whose mind the government implanted the disposition to commit the alleged offense. Sorrells v. United States, 287 U.S. 435, 441, 442, 53 S.Ct. 210, 77 L.Ed. 413. The defendant was lawfully convicted. Nero v. United States, 6 Cir., 189 F.2d 515.

The judgment of the District Court is affirmed.