237 F.2d 97
 Sylvester POLIAFICO, alias Sam Polo, Appellant,
v.
UNITED STATES of America, Appellee.
Salvatore LAZZARO, alias Sal, Alias Trippo, Appellant,
v.
UNITED STATES of America, Appellee.
Nunzio ROMANO, alias Nunzie, Appellant,
v.
UNITED STATES of America, Appellee.
Ben YOSLOVITZ, alias Benny Farmer, Appellant,
v.
UNITED STATES of America, Appellee.
Anthony CRISCI, alias Tony Crish, Appellant,
v.
UNITED STATES of America, Appellee.
Harry RICCOBENE, alias Anthony DiMarco, Appellant,
v.
UNITED STATES of America, Appellee.
Salvatore PIERI, alias Sam Pieri, Appellant,
v.
UNITED STATES of America, Appellee.
Michael ERRA, Appellant,
v.
UNITED STATES of America, Appellee.
Anthony NASELLI, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 12476-12484.
 United States Court of Appeals Sixth Circuit.
 Aug. 31, 1956.
As Amended Nov. 26, 1956.
 
 Henry C. Lavine, Cleveland, Ohio, William D. O'Neill and Nathan D. Seeberg, Buffalo, N.Y., on the brief, for Sylvester Poliafico and Anthony Naselli.
 Jacob W. Friedman, New York City, for Salvatore Lazzaro and Nunzio Romano.
 Frank Steel, Akron, Ohio, for Ben Yoslovitz.
 George J. Todaro, New York City, for Anthony Crisci.
 William J. Dammarell, Cincinnati, Ohio, Jacob Kossman, Philadelphia, Pa., on the brief, for Harry Riccobene.
 William D. O'Neill, Buffalo, N.Y., Henry Lavine, Cleveland, Ohio, and Nathan D. Seeberg, Buffalo, N.Y., on the brief, for Salvatore Pieri and Michael Erra.
 Eben H. Cockley, Cleveland, Ohio, Sumner Canary, Cleveland Ohio, on the brief, for United States.
 Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.
 McALLISTER, Circuit Judge.
 
 
 1
 All of the appellants were indicted for conspiracy to violate the narcotic lwas,[1] and a number of them were also charged with various substantive offenses involving violations of the same laws. The conspiracy was, as claimed by the government, widespread and long continued, involving many persons. Eighteen of the twenty defendants actually went to trial. An order of severance was made as to one defendant, because of his illness; one pleaded guilty before trial; the district court dismissed the case against another; and the jury found one defendant not guilty. The remaining defendants, including all of the appellants, were found guilty of conspiracy. Four of the appellants were also found guilty of the substantive offenses charged.
 
 
 2
 On their nine separate appeals, the convicted defendants raise numerous claims of error. They contend that the evidence was insufficient to sustain the convictions; that the trial court erred in both admitting and excluding testimony and in its instructions to the jury; that the grand and petit juries were improperly constituted; that there was improper venue as to certain of the defendants; and that the closing argument of the district attorney was prejudicial and constituted reversible error.
 
 
 3
 The primary contention of the majority of the appellants is that, while the government charged a single conspiracy, its evidence only purported to disclose, instead, a number of different conspiracies; that the parties alleged to be in one of the conspiracies were not proved to be in the other conspiracies; and that, accordingly, there was a fatal variance between the indictment and the proof. The foregoing claim requires some consideration of the relationship between the appellants, as well as the acts claimed to have been committed by them.
 
 
 4
 James Mandanici, named as one of the co-conspirators in the indictment, and Frank Consolo, who pleaded guilty to the conspiracy count, were two of the chief witnesses for the government. According to their evidence, appellant Poliafico was the organizer and ringleader of the conspiracy which had its principal base of operations in Cleveland, Ohio. It was Poliafico who first solicited Mandanici and Consolo, both government witnesses, as above mentioned, to distribute the narcotics-- which were to be delivered to him at a later date-- at a salary of $100 a week; and it was through the negotiations of Poliafico that appellants Riccobene and Crisci came to Cleveland from New York City, bringing the first half kilo of pure heroin which Riccobene carried in a cigar box. Upon his arrival, Riccobene explained to Poliafico and Consolo that they needed a scale, cellophane bags, and milk sugar in order to mix, weigh, and package the heroin, and told them that he wanted to show the others how to mix it. When the required articles were procured by Crisci and Poliafico, Riccobene dumped the half kilo of heroin on a table and mixed it with the milk sugar, and Poliafico and Crisci weighed it and poured it into one-ounce packages.
 
 
 5
 After they were through mixing the heroin, Riccobene discussed with Poliafico, Crisci, and Consolo the cost of the first half kilo of heroin, and the fact that it was on consignment; and the agreement that after it had been sold to addicts, and paid for, they would received the second half kilo. The heroin in question was subsequently distributed and sold, in a mixture with milk sugar, or quinine, in one-ounce packages. The first half kilo was thereafter paid for by Poliafico and his associates, and further shipments of heroin continued to be delivered to them by various of the alleged co-conspirators, and sold in the small ounce packages to individual drug addicts. Money collected from the sales was paid to Crisci. On a subsequent occasion, Crisci mixed up the remainder of the heroin, when the supply was getting low. Thereafter, on several occasions, Crisci came to Cleveland to collect money in payment for heroin from the Poliafico group.
 
 
 6
 Evidence introduced on behalf of the government, in addition to the proofs concerning the activities of appellants Poliafico, Riccobene, and Crisci, and the government witnesses Mandanici and Consolo, shows that appellant Naselli, pursuant to arrangements with Crisci and subsequent to the initial delivery by Riccobene, brought heroin from New York and delivered it to Poliafico and Mandanici at a point on the outskirts of Cleveland; and that Naselli made collection of payments for the heroin at various times when he made other deliveries.
 
 
 7
 The government's proofs further show that appellant Erra carried on successful negotiations in New York to secure additional heroin for Poliafico and his associates in Cleveland, and made arrangements for the delivery of the narcotics that were afterward carried out; that appellant Yoslovitz, on one occasion, was present at the 'Spanish Village' with Erra and Mandanici, when Poliafico stated that he had some heroin at Yoslovitz's apartment, and that they were all going over to pick it up; and that Yoslovitz then went to his apartment with Poliafico, Erra, and Mandanici, and there procured a half kilo of heroin, which he delivered to mandanici and which he had previously secured from New York. Erra was living in the same apartment with Yoslovitz. Yoslovitz later accompanied Poliafico and Mandanici to Pennsylvania where they met appellant Pieri, from Buffalo, for the purpose of making arrangements to secure heroin from him. Pieri told them that he would let them know in a few days about the matter, and afterward delivered ten ounces of heroin to Poliafico and Mandanici.
 
 
 8
 As to appellant Lazzaro, the evidence of the government showed that pursuant to arrangements made in New York by Poliafico, who told Mandanici that more heroin would be brought to Cleveland in a day or two by a man named Lazzaro, Lazzaro came to Cleveland with a half kilo of heroin which he delivered to mandanici who was acting for Poliafico in the matter. As to appellant Romano, Mandanici testified that the half kilo of heroin delivered by Yoslovitz came from Romano in New York. It appeared from the proofs that Poliafico had introduced Mandanici to Romano, informing him that Romano had come to Cleveland to collect the money for the half kilo of heroin; that when Poliafico and Mandanici had first met appellant Erra, he informed them that Romano was his partner, and, thereafter, would let Poliafico know in advance whenever Romano was going to come to Cleveland. After several of their transactions in heroin, Poliafico and Mandanici met Erra and Romano in New York and discussed certain indictments for violation of the narcotic laws that had been returned in Cleveland against other parties, not involved in this case. Poliafico and Mandanici told them not to expect money so fast in payment for the heroin, as they were going to 'lay dead' for awhile because of the indictments that had just been announced in the newspapers; and that, in reply, Romano and Erra had said: 'All right.'
 
 
 9
 Were the appellants engaged in the same conspiracy? Poliafico was the man who organized and promoted the enterprise of buying heroin in large, unadulterated quantities and reselling it, at a profit, in small, adulterated quantities. He and certain appellants carried on negotiations for the purchase of heroin from other appellants, and bought it from them. He arranged with other appellants to adulterate the heroin so purchased and to sell it to drug addicts. All of the appellants were either selling heroin to Poliafico and his associates, or reselling it for them, or carrying on negotiations for such sales, or making payments therefor, or delivering heroin for resale, or reselling it. The purchase of heroin and the resale of heroin, in this case, was concerned with one enterprise, which could be called the Poliafico deal, in the parlance of the underworld. The over-all conspiracy was the plan, conceived by Poliafico and his associates, to buy and sell heroin at a profit. The suppliers knew that the purchases were for resale and they also knew that several conspirators were involved in the purchases. The fact that one such supplier did not have dealings with another supplier does not matter. If each performs the same role at successive stages for the same ends, and both know and participate in the plan of the others to buy and sell heroin at a profit, each is guilty as a conspirator. United States v. Tramaglino, 2 Cir., 197 F.2d 928. When two or more persons are shown to have been engaged in the same unlawful conspiracy, having for its object the same common and unlawful purpose, it is not necessary to prove the knowledge by one of the dealings, or even of the existence, of the others, in order to render evidence of the actions of those others admissible against that person. There was one conspiracy in this case-- the continuing scheme of buying and reselling heroin. The proofs of the government show that all appellants were associated in this scheme, some by virtue of selling or delivering the heroin to the Poliafico group, others because of being associated with the group in carrying out the scheme, collecting money through resales of the drug, making payments to suppliers, or carrying on negotiations for the purchase or resale. All appellants knew of the conspiracy. The suppliers knew that the Poliafico group must resell the heroin at a profit; and all associated with Poliafico in the resale of the heroin knew that Poliafico must buy it from suppliers and that the resales must be at a profit. 'One who commits an overt act with knowledge of the conspiracy is guilty, even though he is absent when the crime, which is the object of the conspiracy, is committed. Such person's knowledge as to the scope of the conspiracy, may be limited, and he need not know all the details of the plan or the operations. Knowledge of membership in the conspiracy, the part played by each of the members, and the division of spoils is immaterial. , he must know the purpose of the conspiracy, however, otherwise he is not guilty.' Marino v. United States, 9 Cir., 91 F.2d 691, 696, 113 A.L.R. 975. The addition of new members to a conspiracy or the withdrawal of old ones from it does not change the status of the other conspirators. Nor is it necessary to prove that a conspirator engaged directly in the buying or selling of narcotics or received a profit therefrom. United States v. Cohen, 3 Cir., 197 F.2d 26. A conspiracy is complete on the forming of the criminal agreement and the performance of an overt act in furtherance thereof. Singer v. United States, 6 Cir., 208 F.2d 477; Pinkerton v. United States, 5 Cir., 151 F.2d 499. Once the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it. United States v. Cohen, supra. 'The jury having found guilt, slight evidence connecting a defendant with a conspiracy may be substantial and, if it is, is sufficient.' Meyers v. United States, 6 Cir., 94 F.2d 433, 434.
 
 
 10
 The conspiracy in this case was complete, according to the government's proofs, on January 10, 1952, when poliafico, Crisci, Riccobene, and Consolo met to receive the heroin which Riccobene had brought to cleveland from New York, and after a discussion of the methods of adulteration and sale of the narcotics, obtained scales, bags, and milk sugar, adulterated the pure heroin, weighed it, and put it into ounce packages, for the purpose of sale to their first customers.
 
 
 11
 A conspirator may join at any point in the progress of the conspiracy and be held responsible for all that may be or has been done; Braverman v. United States, 6 Cir., 125 F.2d 283, 286, reversed on other grounds 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23; United States v. McKee, 2 Cir., 220 F.2d 266; and the foregoing applies to those appellants who did not participate in the formation of the conspiracy, but joined it at various times thereafter, for the evidence discloses that, as the conspiracy enlarged and progressed through its various stages, new members joined it. Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and a collocation of circumstances. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. There was substantial evidence to connect all of the appellants with the conspiracy.
 
 
 12
 Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, is relied upon by appellants as showing that the instant case involved several different conspiracies, instead of one, whereas appellants were charged with only one conspiracy, and that there was, therefore, a fatal variance between the indictment and the proofs. In the Kotteakos case, the evidence disclosed eight or more conspiracies by separate groups of defendants which had no connection with each other except that they utilized one Brown as a broker to handle fraudulent applications for loans. In Blumenthal v. United States, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154, the court, in distinguishing the Kottakos case involving several conspiracies from a case involving one conspiracy, said:
 
 
 13
 'Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.
 
 
 14
 'Here the contrary is true. All knew of and joined in the overriding scheme.'
 
 
 15
 On the same grounds, the Kotteakos case is, likewise, distinguishable from the instant case.
 
 
 16
 Riccobene contends that there is no proof that he was guilty of conspiracy. He claims there is no evidence that the substance adulterated by him at the first meeting with Poliafico, Consolo, and Crisci was actually heroin; that, in any event, his only connection with the appellants was the single delivery which he made; that he never saw any of the appellants thereafter; and that his connection with the affair ended with this on meeting and delivery. He, therefore, submits that there was no proof that he was knowingly associated in the unlawful common enterprise to import the narcotic and dispose of it unlawfully, as charged in the indictment. As to the nature of the substance which Riccobene delivered, it was not necessary for the government to prove that it was heroin, for he was not convicted of the substantive offense of selling or delivering heroin, but of conspiracy; and conspiracy is a crime in and of itself, separate and apart from the crime of importation, purchase, sale, and transportation of narcotics. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23; Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489. As heretofore stated, the crime of conspiracy is complete upon the formation of the illegal agreement and the commission of an overt act pursuant thereto; and the overt act need not constitute a crime. Braverman v. United States, supra. Here, the conspiracy was to violate the narcotic laws; and when the parties agreed to this and took the steps to carry it out, the offense was complete even without proof that the substance delivered was heroin. Poliafico, Consolo, Crisci, and Riccobene assumed it to be heroin; they spoke of it as heroin; they adulterated it and made samples for customers; the first delivery of the half kilo cost $8,000; they sold it as heroin; and received from $100 to $200 an ounce for it.
 
 
 17
 'No formal agreement is necessary to constitute an unlawful conspiracy. Almost always, the crime is a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose. Stack v. United States, 9 Cir., 27 F.2d 16; Pearlman v. United States, 9 Cir., 20 F.2d 113. The agreement may be shown by a concert of action, all the parties working together understandingly with a single design for the accomplishment of a common purpose. Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975. It is the common design which is the essence of the conspiracy or combination; and this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but always leading to the same unlawful result. United States v. Harrison, 3 Cir., 121 F.2d 930; Allen v. United States, 7 Cir., 4 F.2d 688. Often, if not generally, direct proof of a criminal conspiracy is not available, and the common purpose and plan are disclosed only by a development and collocation of circumstances.' American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, 107.
 
 
 18
 It was not necessary for the government to prove that the substance delivered by Riccobene was heroin in order to convict him of a conspiracy to violate the narcotic laws.
 
 
 19
 As to the contention that Riccobene's single delivery of heroin to the Poliafico group on January 10, 1952, ended his connection with them and, therefore, did not sustain the charge against him of conspiracy, it is true that he told them that he was leaving Cleveland that night to stand trial in the East. It appears, too, that five days later, on January 15, 1952, he was sentenced to prison in Philadelphia. It is contended that when, as admitted, Riccobene told the others that he would show them how to mix the heroin so that he would not have to come back to Cleveland, such a statement indicated that he, and the others, knew that he would be in prison in the future-- 'out of circulation,' as his attorney put it-- and that this was proof that his connection with the enterprise ended when he delivered the heroin, mixed it, and returned to the East. But this does not follow. Riccobene never affirmatively withdrew from the conspiracy, and affirmative action is required to show withdrawal, for a conspiracy, once established, is presumed to continue until the contrary is established. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114; Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975. Riccobene told Poliafico and his associates that when they paid for this first half kilo that he had delivered to them 'on consignment,' they could receive another half kilo. This would indicate that he was engaged in a continuing scheme of supplying heroin to them. His telling them that he would show them how to mix and cut the heroin so that 'in that way, he does not have to come into town' might, with reason, be interpreted to the effect that the operation would be repeated, in the future, and that, by showing them how to mix the heroin for resale, Riccobene would not have to return each time a new delivery was made. Moreover, there was evidence that the profits of the first half kilo sold were to be split equally among the four-- Poliafico, Mandanici, Crisci, and Riccobene. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, sustained the conviction of a defendant for a substantive offense committed by a fellow conspirator while the defendant was in the penitentiary and had no knowledge of the crime. There was substantial proof to sustain Riccobene's conviction for conspiracy.
 
 
 20
 Appellant Riccobene asked the court to charge the jury that before one could be a conspirator, it must be shown that he had a stake in the enterprise. The court did charge to this effect, and added that if a person, knowing about a conspiracy and with intent to join it, committed a violation of law in furtherance thereof, that would be evidence of a stake in the conspiracy. Both Riccobene and Erra complain of this instruction, although neither took exception to it, as required by Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. It was not necessary to show a financial interest in the conspiracy. The interest may be that of seeking, by action, to make the venture succeed. See United States v. Peoni, 2 Cir., 100 F.2d 401; Morei v. United States, 6 Cir., 127 F.2d 827. The stake is in the success of the enterprise. United States v. Di Re, 2 Cir., 159 F.2d 818.
 
 
 21
 Riccobene and several of the other appellants contend that the trial court was in error when it sustained objections to certain questions asked Consolo and Mandanici on cross examination. It will be remembered that Consolo was a government witness and not on trial as a defendant, as he had already pleaded guilty. One of the questions asked Consolo was whether a burglary he committed in 1937 was the first time he had committed a burglary, or whether it was only the first time he had been caught and sentenced for that crime. He was also asked to explain the circumstances when he was arrested for having a revolver in his possession. The trial court sustained objections to these questions. As going to the credibility of the witness, Consolo, these questions, under certain circumstances, might have been proper, and the ruling of the court in sustaining objections thereto might have resulted in prejudicial error, but not in this case. For it appeared from Consolo's prior testimony in the case that he had been previously convicted of burglary; that at another time, he had been convicted of violation of the fire arms law; that he had been convicted of violation of the Dyer Act, 18 U.S.C.A. 10, 2311-2313, for transporting a stolen automobile across state lines; and he had pleaded guilty to the heroin conspiracy in the instant case. It also appeared that he had served a year and a day on the fire arms conviction, and had been serving a five-year term on the Dyer Act charge, first, in Alcatraz, and afterward, in Leavenworth Penitentiary. He had also previously been guilty of a jail break when held for one of the offenses. As far as criminal conduct went, the jury knew from the foregoing what Consolo's record was, and, in addition, knew that he was one of the ringleaders in the heroin conspiracy, to which he had pleaded guilty and for which, at that time, he was serving a sentence in the penitentiary. It would not have added, substantially, to his criminal record or further affected his credibility to proceed to investigate further the circumstances with respect to his having a revolver in violation of law-- for which he had been convicted and served a sentence-- or to pursue an inquiry into whether he had been engaged in other burglaries for which he had not been convicted prior to the burglary for which he had been convicted. The trial court acted with discretion to keep the examination of witnesses within some bounds as to time and substance; and its rulings did not result in prejudicial error.
 
 
 22
 As to Mandanici, his cross examination, as stated by government counsel, occupies more than 400 pages of the transcript. He had pleaded guilty to the conspiracy of violating the narcotics law in the instant case. On cross examination, Mandanici had testified that he had been sentenced to serve a five-year term and had been taken to Milan Penitentiary on this sentence; that thereafter he was transferred to Terre Haute; and afterward, brought to a county jail where he was confined at the time of his testimony. He was then asked whether that jail was located in or near Cleveland, and the trial court sustained an objection to this question. However, on subsequent cross examination, Mandanici disclosed that the jail in question was located at Elyria. What appellants wanted was information about the jail where Mandanici was held, and this subsequent cross examination elicited that fact. There could, therfore, be no prejudice to appellants from the court's prior ruling. Nor was it prejudicial error to sustain objection to the question addressed to Mandanici as to whether he would lie to gain his liberty and in order to keep his family from being sent to jail for narcotic violations. There was no evidence that the members of Mandanici's family were engaged in narcotic activities-- unless it was his brother-in-law, Consolo, who had already pleaded guilty-- and Mandanici himself was already serving a sentence of five years on his plea of guilty. It was not improper for the trial court to sustain objections to the questions as to whether the testimony of another witness was correct; as to what Consolo had said during the trial of another case unrelated to the instant case with regard to the veracity of government witnesses; as to where Consolo's wife had secured money to buy her automobile; and the reasons why he himself gave up his job to sell narcotics. We have reviewed numerous other complaints with respect to the court's rulings sustaining objections to questions asked during the cross examination of Consolo and Mandanici and find that none could be said to result in prejudicial error.
 
 
 23
 During the cross examination of Mandanici, it appeared that he had made three written statements to the federal narcotic agents prior to the trial. The first statement was given to appellants' counsel during his cross examination. The government declined to give the other two statements to counsel upon their asking for them, and the trial court, upon the request of appellants' counsel for a ruling on their demand to see the statements, ruled that the demand was refused. Later, however, the statements were voluntarily, during the trial, turned over to appellants' counsel and the court assured them that they could call Mandanici for further cross examination with respect to them, and the government counsel stated the witness would be available if appellants' attorneys desired to recall him. Counsel for appellants later used these statements in cross examining another witness, and, in lieu of recalling Mandanici, entered into a stipulation as to what he would testify that was contradictory of Consolo, to the effect that he would say that the latter told him that it was Crisci who showed how the heroin should be mixed at their first meeting. Consolo had testified that Riccobene was the man who had showed them how to mix the heroin with milk sugar. As appellants did not avail themselves of this full opportunity given by government counsel and the court of cross examining Mandanici on all of the written statements he had made prior to trial to the federal agents, they have no basis to claim prejudicial error on the ground that the court, prior to that time, had been of a contrary opinion. They cannot now be heard to complain, since they did, in fact, receive Mandanici's pretrial statements; they had an opportunity to cross examine him as to those statements; and they brought the inconsistencies contained therein to the attention of the jury.
 
 
 24
 Appellants claim that it was error on the part of the court to permit the government attorney to cross examine two government witnesses on their contradictory grand jury testimony, after they had turned hostile, and the government had been taken by surprise. The prior testimony, which was read to the witnesses, was for the purpose of refreshing their memory, and did, in fact, refresh their memory in a number of instances. The trial court clearly and thoroughly explained to the jury that such cross examination was permitted only to refresh the witnesses' recollection, and that the questions and answers read to them were not evidence to be considered by the jury in the case.
 
 
 25
 'When a party is taken by surprise by the evidence of his witness, the latter may be interrogated as to inconsistent statements previously made by him for the purpose of refreshing his recollection and inducing him to correct his testimony; and the party so surprised may also show the facts to be otherwise than as stated, although this incidentally tends to discredit the witness.' Hickory v. United States, 151 U.S. 303, 309, 14 S.Ct. 334, 336, 38 L.Ed. 170.
 
 
 26
 In Di Carlo v. United States, 2 Cir., 6 F.2d 364, 368, the court said:
 
 
 27
 'The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge. Nothing is more unfair than to confine a party under such circumstances to neutral questions. Not only may the questions extend to cross-examination, but, if necessary to bring out the truth, it is entirely proper to inquire of such a witness whether he has not made contradictory statements at other times. He is present before the jury, and they may gather the truth from his whole conduct and bearing, even if it be in respect of contradictory answers he may have made at other times. * * * The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court.'
 
 
 28
 In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 849, 84 L.Ed. 1129, the Supreme Court said, in a similar case:
 
 
 29
 'As in case of leading questions, * * * such use of grand jury testimony for the purpose of refreshing the recollection of a witness rests in the sound discretion of the trial judge. See Di Carlo v. United States, (2 Cir.) 6 F.2d 364, 367-368; Bosselman v. United States, (2 Cir.) 239 F. 82, 85; Felder v. United States, (2 Cir.) 9 F.2d 872. He sees the witness, can appraise his hostility, recalcitrance, and evasiveness or his need for some refreshing material, and can determine whether or not under all the circumstances the use of grand jury minutes is necessary or appropriate for refreshing his recollection.'
 
 
 30
 We find no error in the rulings of the trial court on the cross examination of these hostile witnesses or in its instructions to the jury with regard to their testimony that they had been threatened and intimidated by the government officials prior to their testimony before the grand jury.
 
 
 31
 During the impanelling of the petit jury, counsel for appellants, for the first time, challenged the selection of the grand jury and the petit jury on the ground, as he stated, 'that a review of the panel itself discloses a probability of the exclusion of nationality groups and race groups, from an examination of the names themselves and from the persons who have been examined here before, as of yesterday, and from the fact that some of the jurors have had jury service within just a few months before this.' In answer to the trial court's question addressed to him, counsel admitted that he was not in a position to say that the selection of the juries had not been made in accordance with the statute. Counsel had no knowledge as to how the juries were selected. He was under the impression that there was no jury commissioner, until informed by the court that there was, and that such jury commissioner had functioned in the selection of the jurors. Counsel had not examined the statute on the subject; and he actually voiced nothing more than a suspicion that the jurors were not selected in accordance with law. The names of all of the jurors who had been summoned had been available for at least two weeks for anyone who desired to secure them at the office of the clerk. When appellants' counsel found that there was actually a jury commissioner in existence, he asked that she be brought from her home two hundred miles away in order that he could conduct an examination of her methods in selecting jurors. All of this occurred after the better part of a day had been consumed in attempting to select a jury.
 
 
 32
 The challenges to the selection of the juries were not specific; they did not set forth distinctly any grounds relied upon; they did not purport to rely upon any facts; they embodied merely the opinions and conclusions of counsel; no affidavits were filed, and no evidence was introduced to support any irregularities; it was not alleged that the method of selection of the jurors did not comply with the law.
 
 
 33
 In keeping with the provisions of Rule 12 of the Federal Rules of Criminal Procedure, a motion challenging the method of impanelling a grand jury must be made before the plea is entered except in instances where the court permits it to be made within a 'reasonable' time thereafter. Failure to raise the objection within the prescribed time constitutes a waiver. See Notes of Advisory Committee on Rules, Federal Rules of Criminal Procedure, rule 12 note, 18 U.S.C.A. Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624; Wright v. United States, 8 Cir., 165 F.2d 405, 407; Carruthers v. Reed, 8 Cir., 102 F.2d 933, 939.
 
 
 34
 In the absence of evidence to the contrary, it will be presumed that the officers charged with selecting a jury have acted according to law. A challenge to the array most be supported by evidence. Under the foregoing circumstances, it was not error on the part of the trial court, during the examination of the jury, to refuse to summon the jury commissioner to come from her home two hundred miles distant to submit to examination by appellants' counsel of the possibility that something might turn up to strengthen a suspicion.
 
 
 35
 Error is claimed because of the action of the trial court in asking Mandanici whether he would waive the privilege of certain confidential communications and, upon his refusal to do so, in excluding testimony concerning such communications. It appeared that one of the counsel for appellants had previously represented Mandanici as his lawyer when he was charged with violating the narcotic laws. On the cross examination of Mandanici, his former lawyer asked him various questions with regard to facts and information that had come to the lawyer's attention respecting Mandanici's violations of the narcotic laws. The court committed no prejudicial misconduct and was not in error in advising Mandanici of the fact that the communications and information received by the lawyer while acting in his capacity as Mandanici's attorney were privileged; that he did not need to waive the privilege; and in excluding such testimony on Mandanici's refusal to waive his rights. The information was privileged. It could only be waived by Mandanici. Robinson v. United States, 6 Cir., 144 F.2d 392.
 
 
 36
 Certain of appellants' counsel complained that they were not permitted to ascertain whether Mandanici would waive the privilege after he had claimed it. They submit in their briefs that they 'proposed' the question in the following statement to the court:
 
 
 37
 'I want to ask him whether he at this time is willing to waive the privilege so that he can relate to us what the conversation was.'
 
 
 38
 Counsel declare that the trial court then suggested that the question be objected to, and thereupon, proceeded to sustain the objection. None of the foregoing appears in the printed appendices of appellants which were filed, aggregating more than 600 pages, and containing the record references; nor were any typewritten copies of unprinted portions of the record thereafter filed, as is permitted by Rule 16(6) of the Rules of this Court. It is provided that the appendices filed by the parties contain such parts of the record as counsel deem it essential for the judges of the court to read in order to decide the questions involved. Paragraphs (2)(e) and (4)(e) of Rule 16 of the Rules of this Court. In any event, even if the question were asked of the witness (which it was not) and the court had sustained an objection to it, such action would not result in reversible error. The witness had already declared that he would not waive the privilege; there was nothing to indicate that he had changed his mind; and, since limitations on cross examination rest within the discretion of the court, it would be necessary to show an abuse of that discretion in order to establish the claimed prejudicial error. No such abuse of discretion was shown. In a similar instance involving the claim that the trial court was guilty of abuse of discretion in unduly limiting a cross examination, the Supreme Court observed: 'We must guard against the magnification on appeal of instances which were of little importance in their setting.' Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 471, 86 L.Ed. 680.
 
 
 39
 It is claimed that while the conversations which Mandanici had with his counsel may have been privileged, information which had come to such counsel from third parties was not so privileged, and the court was, therefore, in error in rejecting testimony concerning it, and in refusing to permit Mandanici to be cross examined with respect thereto.
 
 
 40
 One of the questions which Mandanici's former attorney asked him was the following:
 
 
 41
 'Did you ever tell your friends that lived in your neighborhood that you were not the one that left two ounces of narcotics under a mail box?'
 
 
 42
 The court asked counsel if the question related to the narcotics charge against Mandanici to which he had pleaded guilty. Counsel answered:
 
 
 43
 'Yes, it does, your Honor, but it is not--
 
 
 44
 'The Court: * * * Was that statement made in your presence?
 
 
 45
 'Counsel: No, it was not.
 
 
 46
 'The Court: Did it come to you at the time you were representing him as a lawyer?
 
 
 47
 'Counsel: Yes, your Honor, it did, but that--
 
 
 48
 'The Court: Sustained. We are not concerned about that.'
 
 
 49
 On the following day, counsel for one of the other appellants was cross examining Mandanici and asked:
 
 
 50
 'Q. Mr. Mandanici, I believe yesterday afternoon Mr. Redmond was cross examining you, is that correct? A. Yes.
 
 
 51
 'Q. And at one point he asked you certain questions concerning conversations that you and he had while he was your lawyer, is that correct? A. Yes.
 
 
 52
 'Q. And you refused to answer that because you wanted to avail yourself of the privilege a client has?'
 
 
 53
 We do not have the transcript of the above portion of the record before us, as it was not included in the printed appendices, as required by the Rules of this Court, if the judges are to consider it; and we take the excepts not from the record, but merely from statements in the briefs. But the last questions, above quoted, seem to refer to conversations between Mandanici and his counsel; and these would clearly be privileged. If they were not conversations, but related to something that his counsel had heard from third parties, while engaged in his defense, the cross examination was obviously being carried on by Mandanici's former attorney for the purpose of attacking his credibility. But even though Mandanici had told his friends that he did not put two ounces of heroin under the mail box, as was suggested in counsel's question, that would not contradict anything he had testified to; and the court properly limited the cross examination with regard to such extraneous matter.
 
 
 54
 Appellant Yoslovitz claims error because the trial court did not grant him a severance and a separate trial. He was indicted with nineteen others for the conspiracy, and with other defendants for substantive offenses. He was convicted on one conspiracy count and one substantive count. A defendant is not entitled ot a severance in a conspiracy case; Metcalf v. United States, 6 Cir., 195 F.2d 213; and he was properly indicted both for conspiracy and for the substantive offense; Chadwick v. United States, 5 Cir., 117 F.2d 902. There was substantial evidence to support his conviction for conspiracy.
 
 
 55
 The count of the indictment which charged Yoslovitz with violation of the substantive offense pertained to a kilo of pure heroin which he had obtained from appellant Romano in New York. Subsequently, a part of that heroin was analyzed by a government chemist who found that it contained heroin. Thereafter, the drug was destroyed, after the disposition of certain cases before the court, since there did not, at that time, appear to be future need for it. On the trial, the chemist testified that he had analyzed the substance and found it to contain heroin; that he mailed it to the Drugs Disposal Committee in Washington; and a member of that committee testified that it had been destroyed. The court held that the fact that the narcotics were destroyed after analysis did not prevent introduction of the proof of such analysis, and that the fact that the drug had been destroyed went solely to the weight of the evidence. We consider this a correct ruling. In any event, Yoslovitz was sentenced to two and a half years on each of the two counts, the sentences to run concurrently. Even though a sentence on one of such counts be erroneous, the fact that they were concurrent would not prejudice appellant. When sentences run concurrently on a multiple-count indictment, even if error exists as to one count, it will not affect the sentence or require a reversal. Singer v. United States, 6 Cir., 208 F.2d 477; Hupman v. United States, 6 Cir., 219 F.2d 243.
 
 
 56
 Appellant Poliafico was sentenced to serve five years on the conspiracy count and five years on each of the substantive counts. He contends that the evidence proving the substantive counts included every element of the offense charged in the conspiracy count, and that, therefore, the sentence on the conspiracy count constituted error and should be set aside. In advancing his contention, appellant relies upon our holding in Krench v. United States, 6 Cir., 42 F.2d 354, in which it was held that where a defendant had been charged in a substantive count with unlawfully bringing merchandise into the country, and on a count for conspiracy to commit the substantive offense, a sentence on each of the two counts would constitute double punishment. In the Krench case, proof of the substantive offense included every element of the conspiracy. But under the facts of that case, the defendant was, in reality and in law, being punished twice for the same act. This was because, although the substantive offense charged him with unlawfully bringing the merchandise into the country, he did not actually do so himself, but only procured others to do so. In effect, it was held that procuring others to bring merchandise into the country, and conspiring with others to bring it in, constituted the same act and was proved by the same evidence; and that a sentence on each of the two counts could not stand. In the instant case, there is some slight similarity to the Krench case in that appellant was convicted of unlawfully and knowingly facilitating the transportation and concealment of the heroin, and of conspiring to facilitate the transportation, as well as unlawfully conspiring to purchase, distribute, and sell the narcotics. But, in any event, there is here no reversible error in the court's sentence of Poliafico on the conspiracy count and on the three substantive counts, inasmuch as the conspiracy count was made to run concurrently with one of the substantive counts. As heretofore said, even if error exists as to one count, it will not affect a valid sentence on another count, if the sentences run concurrently. As to the three substantive counts, they were based upon different acts of appellant committed during different months, and each required different evidence. With respect to the sentences on these counts, there was no error.
 
 
 57
 Appellant Pieri raises the question of proper venue as to him, and contends that the trial court erred in denying his motion for acquittal on the substantive counts that he had facilitated the transportation and concealment of narcotic drugs in the Northern District of Ohio, inasmuch as the government's proofs purported to show only deliveries of heroin by Pieri in Buffalo, New York, and in Erie, Pennsylvania. The question of venue was not raised until the conclusion of the government's proofs. Objection to venue is waived by going to trial on the merits without raising the question. United States v. Jones, 2 Cir., 162 F.2d 72; Hagner v. United States, 60 App.D.C. 335, 54 F.2d 446. Moreover, the evidence is to the effect that when Pieri handed these narcotics to one of the other appellants, knowing that the latter would take them to Cleveland, he facilitated their transportation into the Northern District of Ohio. Under Title 18 U.S.C. 3237, it is provided that any offense against the United States, begun in one district and completed in another, may be prosecuted in any district in which such offense was begun, continued, or completed, and that any offense involving transportation in interstate commerce may be prosecuted in any district from, through, or into which such commerce moves. The above section makes transportation a continuing offense; and venue as to Pieri would lie either in Pennsylvania or Ohio.
 
 
 58
 Much importance is given in the briefs of two of the appellants to claimed error of the trial court in receiving certain evidence bearing upon the presence in Cleveland of appellants Crisci and Riccobene in January, 1952. Consolo, in his testimony, definitely stated that the two appellants were in a room in the Tudor Arms Hotel in Cleveland on or about January 10, 1952. The secretary and treasurer of the hotel testified that the two registration cards showed that Crisci, alias Crish, and Riccobene, alias Di Marco, registered in the hotel on that date, and both occupied Room 1022 through January 14. In addition, the hotel official testified that the registration cards are filled out by the guest rather than by the clerk. The testimony of the hotel official was not objected to. Counsel for Crisci, however, objected to the receipt of the registration cards in evidence.
 
 
 59
 As to another occasion, both Consolo and Mandanici testified that Crisci stayed at the Colonial House Motel in January 1952. The manager of the motel testified that the original registration cards had been destroyed in a fire, but that a daily transcript of such cards showed Crisci occupied a room in the motel from January 15 ot January 19.
 
 
 60
 Counsel for Crisci sought to have the bail bond applications of Crisci and Riccobene introduced in evidence in order that the jury could compare the signatures thereon with the signatures on the Tudor Arms Hotel registration cards. But the government did not contend that appellants had signed the cards. The court's ruling permitting the registration cards to be introduced in evidence and refusing to admit the bail bond applications to be introduced could not be said to constitute prejudicial, reversible error; and the same is true of the trial court's refusal to instruct the jury that there was no evidence that Crisci had registered at the Tudor Arms Hotel, especially in the light of the uncontradicted testimony of the government witnesses that Riccobene and Crisci had occupied a room in that hotel, and that Crisci had occupied a room in the motel, during the time in question.
 
 
 61
 Many other complaints are made by appellants with respect to the rulings of the trial court during the case and his failure to instruct the jury as requested. It was not error for the court to exclude proffered testimony of the witness Giaimo as to conversations, with the government witness Mandanici, with regard to making trips to Chicago and getting packages for him containing something undisclosed, in view of the fact that Mandanici had not been questioned as to any of the matter sought to be shown by such witness, and that the proffered testimony in no way tended to controvert anything that Mandanici had testified to. Robinson v. United States, 6 Cir., 144 F.2d 392. As to the testimony of defendant Filicia who had remained in the courtroom during Mandanici's testimony, and then pleaded guilty to two counts of the indictment, testifying thereafter as a government witness, it was not error to refuse to permit such testimony on the ground that he had remained in the courtroom after a separation of witnesses had been ordered by the court at the outset of the trial. In Carrado v. United States, 93 U.S.App.D.C. 183, 210 F.2d 712, the appealing parties likewise urged that they were damaged by the testimony of a defendant who, in the midst of the trial, was discharged, and thereafter testified for the government. The argument was advanced that such defendant had the advantage of hearing the testimony of the government witnesses before she testified, and that her counsel had, up to the time, participated in conferences with the counsel of the other defendants. The court, however, ruled that until the witness was discharged as a defendant, she was required to be in the courtroom, and that there was no error regardless of any speculative prejudice to the other defendants because of her presence.
 
 
 62
 As to the claimed error of the court in permitting the substitution of the name, Riccobene, in the indictment for the name, John Doe, it appears from the record that such substitution was made with Riccobene's consent, his attorney on several occasions stating to the court that in this regard, he had no objection.
 
 
 63
 With respect to Poliafico's contention that the trial court refused to give his requested instruction relating to character evidence, the instructions, as given by the court in this regard, were correct. Poliafico had requested the court to charge the jury that evidence introduced on his behalf tending to establish his good character and reputation might, in itself, be sufficient to create a reasonable doubt in the minds of the jury as to his guilt. The court, however, charged instead that the jury could consider such evidence and determine its weight, together with all the other evidence in the case, in arriving at their verdict as to his innocence or guilt. Such an instruction was proper. Edgington v. United States, 164 U.S. 361, 366, 17 S.Ct. 72, 41 L.Ed. 467; Gariepy v. United States, supra.
 
 
 64
 Appellants Riccobene, Erra, and Crisci claim error on the ground that the trial court did not charge the jury as requested by them in the following language:
 
 
 65
 'The failure of any defendant to take the witness stand and testify in his own behalf in this trial does not create any presumption against him. The jury is charged that it must not permit that fact to weigh in the slightest degree against him, nor should this fact ever enter into the discussion or deliberations of the jury in any manner. The Government must prove the guilt of the defendant by its own evidence, and if it fails to do this, or it is not free from doubt, the verdict must be not guilty.'
 
 
 66
 On this phase of the case, the court charged the jury:
 
 
 67
 'Some of the defendants appeared as witnesses in their own behalf, other defendants did not. The defendants Botta, Simons, Warren, Crish, Naselli, Riccobene, and Erra, did not appear and testify as witnesses in this case, but you are not permitted under the law to draw any inference of guilt because of the fact that any of these defendants failed to testify in his own behalf. Consequently, you will draw no such inference against any of them because they did not testify as witnesses.'
 
 
 68
 No exceptions were taken to the charge as given. In any event, it was not erroneous. While Title 18 U.S.C., Section 3481, provides that the failure of a defendant to testify in a criminal case 'shall not create any presumption against him', it is not necessary to charge the jury in the identical language used in the statute; and an instruction that the jury is not permitted to draw any inferences of guilt because of the failure of a defendant to testify, together with the instruction, as given by the court, that the defendants were clothed with the presumption of innocence which remained with them throughout the case 'until such time, if at all, as from a consideration of all the evidence you are convinced, beyond a reasonable doubt, of the guilt of one, some, or all of the defendants,' completely safeguarded appellants' rights within the intendment of the statute. Moreover, the court further charged, in this connection, that 'the burden rests upon the Government to establish the guilt of the defendants beyond a reasonable doubt. This burden remains upon the Government throughout the case, the burden does not shift to the defendants. The defendants are not required to establish their innocence.' There was no error in the charge of the court in this regard.
 
 
 69
 With respect to the contention that the district court committed error in refusing to charge that there was no evidence that Riccobene had received money from the operation of the conspiracy, as well as the complaint regarding the instructions relating to the testimony of accomplices, no exceptions were taken and no merit appears therein. Under federal law, the uncorroborated testimony of an accomplice is sufficient to sustain a verdict of guilty. Nilva v. United States, 8 Cir., 212 F.2d 115. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101, relied upon by appellants, stands only for the proposition that extrajudicial admissions of essential facts or elements of a crime, made subsequent thereto, as well as confessions, require corroboration by independent evidence. See United States v. Cipullo, 2 Cir., 170 F.2d 311, in which an instruction similar to the one given in the instant case was upheld.
 
 
 70
 The closing arguments of the district attorney to the jury were not improper or prejudicial; and claims that the district court exhibited a bias which, in its cumulative effect, prejudiced appellants, are not sustained by the record.
 
 
 71
 Counsel for Riccobene and Crisci further contend that the court committed prejudicial error by refusing to charge the jury, in compliance with their requests, as to the extent of their liability as co-conspirators. These claims reflect the untiring zeal of assiduous counsel, but appear to be without substance. In this regard, the court did instruct the jury: 'Mere association with other conspirators, without more, is not sufficient to convict a person of being a conspirator,' and properly covered the point concerning which appellants complain. On the whole, the court's charge correctly instructed the jury as to the law of conspiracy and the proof necessary to sustain a conviction of the parties charged.
 
 
 72
 It is submitted that the court erred in refusing to charge the jury as follows:
 
 
 73
 'The court charges the jury that certain conversations have been admitted in evidence and are to be considered by you if you find that a conspiracy existed. These conversations, however, may not be applied to any other count but the conspiracy count, unless the conversations were in the presence of the other defendants affected.'
 
 
 74
 As the government suggests, the requested charge is vague and indefinite, and no exception, as is required by Rule 30 of the Federal Rules of Criminal Procedure, was taken to the charge which the court gave in the following language:
 
 
 75
 '* * * it is the law that any declaration made by any one of the conspirators during the period of the conspiracy, and in furtherance thereof, may be considered as evidence not only against the person or persons making such declaration, but against all those who were members of the conspiracy at the time such declarations were made. However, acts and declarations not in furtherance of the conspiracy, even if made during the period thereof, are binding only upon those who make them, and before acts and declarations may be binding upon those who do not make them there must be other proof connecting such persons with the conspiracy.'
 
 
 76
 There was no error on the part of the trial court in refusing to give the requested instruction.
 
 
 77
 With regard to the trial court's instruction as to the possession of one of the defendants being considered the possession of all, which is urged as error by appellants, the court, in effect, charged that once a conspiracy is established, a substantive offense committed by one conspirator pursuant to the conspiracy is attributable to the other conspirators, even though they were not present when the substantive offense was committed. This is in keeping with the rule announced in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489.
 
 
 78
 Other contentions and arguments of appellants are without substance.
 
 
 79
 In accordance with the foregoing, the judgments of the district court are affirmed.
 
 
 
 [1]
 Title 21 U.S.C.A. 174; Title 26 U.S.C. 2553(a) and 2554(a); and Title 18 U.S.C. 2(a)