## BARTOLI v. UNITED STATES.

### No. 6316.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 1, 1951.

Decided Nov. 5, 1951.

Clay S. Crouse for Beckley, W. Va., for appellant.

Milton J. Ferguson, Asst. U. S. Atty., Wayne, W. Va. (A. Garnett Thompson, U. S. Atty., Charleston, W. Va., and Philip A. Baer, Asst. U. S. Atty., Huntington, W. Va., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This appeal is from a criminal conviction in the United States District Court for the Southern District of West Virginia. Appellant, Charles C. Bartoli, (hereinafter called defendant) was indicted and convicted for conspiracy to sell counterfeit money in violation of 18 U.S.C.A. § 88, now § 371.

In the latter part of March, 1948, one Canterbury, a resident of Catlettsburg, Kentucky, approached Switzer Bias, a resident of Huntington, West Virginia, and informed him that he, Canterbury, knew

where counterfeit money could be purchased. He urged Bias to put up the funds to make the purchase. Bias agreed to the scheme and shortly thereafter, Canterbury telephoned defendant at his residence in Chicago, Illinois, to inquire as to the possibility of obtaining the counterfeit currency. Canterbury had been acquainted with defendant for some six or eight years and Canterbury had discussed with defendant the possibility of securing bogus money prior to Canterbury's visit to Bias in Huntington.

Early in April, 1948, Canterbury and Bias went to Chicago and saw defendant. They were told by defendant that no counterfeit money was then available, whereupon they returned to Huntington.

Defendant subsequently telephoned Canterbury in Huntington and informed him that the money could now be obtained. Canterbury then returned to Chicago, verified his telephone conversation with defendant, called Bias in Huntington and had Bias join him in Chicago. These parties then went to defendant's place of business and were shown samples of the money. Defendant also took Bias and Canterbury to a "bookie joint" where he demonstrated to them the ease with which the bogus bills could be passed. Canterbury and Bias as well as defendant made bets with the sample money.

That evening, in defendant's place of business, Bias made a purchase, paying $1,300.00 for $8,000.00 worth of $10.00 counterfeit bills. Defendant then proceeded to show Bias and Canterbury how to discolor the bills by dipping them in damp coffee grounds so as to make the money less susceptible to discovery. Defendant also told Canterbury and Bias that he would be glad to supply them with bogus bills in the future.

After Canterbury and Bias returned to Huntington, a large number of the counterfeit bills soon began to appear in parts of West Virginia and Ohio. Upon investigation by the secret service, and with the help of Canterbury, defendant and one Boulehanis, his business associate, were indicted for conspiracy. Canterbury and Bias were named as coconspirators but were not in-

dicted. The jury acquitted Boulehanis but found defendant guilty. The District Judge then sentenced him to two years imprisonment.

Defendant contends that the facts fail to establish a conspiracy between himself and the conspirators. He argues that aside from the sale of the money to the other parties, he had no part in the conspiracy.

With this contention we cannot agree. Defendant places much reliance upon U. S. v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, which held that a person is not made a party to a conspiracy merely by selling supplies to the conspirators, when he has no knowledge of the conspiracy or knows only that the supplies may be used illegally. In the Falcone case, sugar was sold to the conspirators. Sugar is not normally an article used for an illegal purpose but who can doubt that counterfeit money can have any utility other than to be passed off on the unsuspecting public? Cf. Direct Sales Co. v. U. S., 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674, where the Court found under the circumstances there presented that a wholesale mail-order drug house which sold unusually large quantities of narcotics to doctors through the mails was a party to a conspiracy to violate the Harrison Anti-Narcotic Act, 26 U.S.C.A. §§ 2550 et seq., 3220 et seq.

In our case, defendant unquestionably knew the purpose for which the money was purchased, but he did more than sell the money, he was a participant in the scheme to foist the money upon the public. Defendant showed his cohorts how to discolor the money with coffee grounds so as to make it easy to pass. He demonstrated to them the quality of his money by using it to make bets, and he even, quite generously, assured them that he would supply them with bogus bills in the future.

█ The evidence also shows that defendant was well acquainted with Canterbury and had been in touch with him on several occasions both prior to and after the agreement between Canterbury and Bias to purchase counterfeit money. In our opinion, all these facts, when viewed together, can but lead to the conclusion that

defendant was a party to the conspiracy. The words of Mr. Justice Rutledge in Direct Sales Co. v. U. S., 319 U.S. 703, 713, 63 S.Ct. 1270 are very pertinent here: "There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested co-operation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy. Petitioner's stake here was in making the profits which it knew could come only from its encouragement of Tate's illicit operations. In such a posture the case does not fall doubtfully outside either the shadowy border between lawful cooperation and criminal association or the no less elusive line which separates conspiracy from overlapping forms of criminal cooperation."

 Since we have determined that defendant made himself a party to the conspiracy, the next question is whether there was any overt act in West Virginia in furtherance thereof. See Tabor v. U. S., 4 Cir., 152 F.2d 254, 258; Hall v. U. S., 10 Cir., 109 F.2d 976. In our opinion, the telephone conversations between defendant in Chicago and Canterbury in Huntington and between Canterbury in Chicago and Bias in Huntington were all overt acts in Huntington, West Virginia.[1]

The only other of defendant's contentions which we consider worthy of comment is the allegation that the prosecutor attacked defendant's character when it was not in issue. Defendant in this case took the stand. The record discloses, however, that defendant's character was not attacked except for the purpose of impeaching his testimony, and the court so instructed the jury.

The precise question about which defendant complains tended directly to contradict defendant's own testimony as to his business or occupation. Defendant testified

[1]. Appellant also raises the question of whether the single conspiracy charged in the indictment is sustained by proof of more than one conspiracy and cites Kotteakos v. United States, 328 U.S. 750, 66

that he was a housepainter, and denied that he had bragged that he was a hold-up man who specialized in robbing blackmarketeers who could not squeal. Witness Backstrom was asked: "I will ask you further if on that occasion Mr. Bartoli told you, in words or substance, that he was a hold-up man and that he specialized in robbing black-marketeers, as they were afraid to squeal?" The answer was: "Yes, sir, that is correct." This was not reversible error.

For these reasons the decision of the District Court must be affirmed.

Affirmed.

S.Ct. 1239, 90 L.Ed. 1557. There is nothing in the evidence here to justify the application of the rule laid down in the cited case.