**UNITED STATES of America,
Appellee,**

v.

**Joseph ARMONE, Stephen Grammauta,
Vincent Pacelli, and Nicholas
Viscardi, Appellants.**

**No. 240, Docket 30135.**

United States Court of Appeals
Second Circuit.

Argued March 4, 1966.

Decided July 8, 1966.

Jerome Lewis, Brooklyn, N. Y., for defendants-appellants Armone and Grammauta.

E. Barrett Prettyman, Jr., Washington, D. C. (Robert Kasanof and Albert J. Krieger, New York City, on the brief), for appellant Pacelli.

Edmund A. Rosner, New York City (Edward Cherney, New York City, on the brief), for defendant-appellant Viscardi.

Robert G. Morvillo, New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Howard L. Jacobs, Otto G. Obermaier, John S. Allee, New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, KAUFMAN, Circuit Judge, and FEINBERG, Circuit Judge.*

FEINBERG, Circuit Judge:

Four defendants appeal from convictions of violating the conspiracy provision of the federal narcotics laws, 21 U.S.C. §§ 173, 174. The single-count indictment named twenty-eight co-conspirators, twelve of whom were charged

* Argument heard as District Judge, sitting by designation.

as defendants. The trial was originally scheduled to begin on April 27, 1965, with eight of the named defendants; the remaining four had not yet been apprehended. On that morning, two of the defendants became fugitives, requiring a one-week continuance. The trial of the other six defendants began on May 3, 1965 before Judge Bonsal and a jury.[1] On June 22, 1965, the jury convicted appellants Joseph Armone, Stephen Grammauta, Vincent Pacelli and Nicholas Viscardi, and acquitted Alfred Armone and Alexander Schoenfeld. On July 29, 1965, Judge Bonsal sentenced Joseph Armone to fifteen years, Grammauta to eight years, Pacelli to eighteen years, and Viscardi to five years.[2] We affirm the convictions as to all four appellants.

■ Since the main arguments in this court are not directed to the sufficiency of the evidence, the facts developed at the seven-week trial will not be outlined in detail.[3] Viewing the government's case after a jury verdict of guilty in the light most favorable to the prosecution, as we must, it was, briefly, that appellants, together with the co-defendants and co-conspirators, conspired from 1956 through 1960 to import and distribute heroin in the United States. The drugs originated in France, and would be smuggled into this country with the aid of couriers, who usually travelled as part of their occupations. For example, Clarence Aspelund, a seaman, would transport heroin for exporter Marius Aranci in Marseilles, and Charles Bourbonnais, a flight purser, would bring in the drug for Felix Barnier in Paris. Mauricio Rosal, a Guatemalan ambassador, and Etienne Tarditti, a French businessman, also acted as couriers for Barnier.

The couriers initially delivered the drugs, once in this country, to Joseph Cahill, whose base of operations was New York City; eventually, Charles Hedges and Nicholas Calamaris took Cahill's role. Joseph Armone, one of the importers, would direct the eventual sale of the drugs to domestic wholesalers Vincent Pacelli and Michael Ricucci. Stephen Grammauta and Arnold Romano were also importers. Nicholas Viscardi acted as a storer of the narcotics pending delivery to wholesalers.

Many transactions were detailed at the trial. In 1956, Aspelund met Cahill in New York, and thereafter reported to his principal (Aranci) that Cahill had requested narcotics. A six or eight kilo delivery, by way of Norfolk (because of complications in the New York harbor), was the fruit of this meeting. For the next three years Aspelund would bring in heroin for Cahill about three times a year. Bourbonnais would also bring in narcotics for Cahill, several kilos at a time; both couriers were paid by Cahill. Hedges, meanwhile, became a domestic deliverer for the latter, and was introduced to the conspirators' rendezvous at the Amvets Club; he was eventually promoted to direct dealings with the couriers.

Heroin from Pierre Roulet, an airline steward, would be taken by Hedges at first to Cahill's apartment, and later on to his own, where it would be picked up by Viscardi. Hedges would also deliver to various automobiles under the control of conspirators. In 1958, Hedges was introduced to Pacelli, and arrangements were made for deliveries directly to him by Hedges. In November 1958, Hedges made a delivery to Grammauta, who drove off with Viscardi.

On occasion, Hedges would meet with Joseph Armone at the Amvets Club to discuss some aspect of the dealings with the exporters' couriers. Payments from

---

1. The six remaining defendants were severed.

2. Pacelli and Armone were also fined $20,000.

3. Appellants do contend, in urging reversal, that the evidence disclosed multiple conspiracies, rather than a single conspiracy, and therefore they were not connected up with the alleged single conspiracy. This point will be discussed *infra*.

wholesalers were often turned over to Armone or Grammauta by Hedges, as the latter became involved in sales by the importers. Pacelli would sometimes furnish an automobile for Hedges's transportation. Hedges would pick up heroin at Viscardi's apartment, where it had been stored, for delivery to wholesalers, and he became a liason between Armone and Pacelli. James Godwin, referred to in testimony quoted below in connection with the overt act problem, was Hedges's cousin; Godwin was often a witness to parts of the transactions involving Hedges and Pacelli.

During a lull in 1959–1960, Armone told Hedges that they would "get started" soon after a few things were "straightened out." Activity began again in February 1960, when Pacelli asked Hedges if he could obtain some heroin. Hedges relayed the request to Armone, who complained that Pacelli was not paying in advance, or a high enough price. Armone eventually relented and the transaction was consummated. A few months later, Hedges demanded more money from Armone for himself; the latter authorized an extra $50. In the fall of 1960, certain couriers were arrested; Hedges was convicted in the District of Connecticut in March 1961.[4] Godwin saw Armone that month in an attempt to raise collateral for Hedges's appeal bond. Armone said that he had no money; a few months later Godwin pointed out that unless Hedges was given some help, as in raising bail, he might cooperate with the government. Armone said that another conspirator had gone to prison and "kept his mouth shut and Charlie could do the same." In September 1964, the indictment in the present case was filed, and Hedges became the prosecution's leading witness.

The four appellants make various contentions on appeal. Their arguments will be considered under the name of the defendant primarily pressing the point. Those points raised by defendant Pacelli will be dealt with first; there-after, to the extent that they have not already been covered, the arguments of Armone and Grammauta, made jointly, and Viscardi will be considered.

## I. PACELLI

### § 174 Inference

Pacelli first argues that the trial judge's handling of the statutory inference set forth in 21 U.S.C. § 174 violated his rights under the Fifth and Sixth Amendments. The words of the statute are:

> Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

This provision was held constitutional over forty years ago. Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925); see Orozco-Vasquez v. United States, 344 F.2d 827, 829 (9th Cir. 1965); United States v. Sorenson, 330 F.2d 1018, 1021 (2d Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963 (1965). Referring to this section, Judge Bonsal told the jury that:

> Section 174 further provides that if a defendant is shown to have had possession of the narcotic drug, such possession, unless the defendant explains the possession to your satisfaction, may be deemed by you sufficient evidence for you to infer his knowledge of the unlawful importation of the narcotic drug contrary to law.

> \* \* \* \* \* \*

The government contends, and each of the defendants denies, that each defendant had knowledge of the illegal importation of the narcotic drug. The government contends that the evidence shows that each of the defendants except Alfred Armone was shown to have had actual or constructive pos-

---

4. United States v. Cianchetti, 315 F.2d 584 (2d Cir. 1963).

session of the narcotic drug and that they have not offered an explanation as to their possession. You will recall that Section 174 which I just referred to, provides that if a defendant has actual or constructive possession of the narcotic drug, you may infer that he knew the narcotics were illegally imported into the United States unless he has given you a satisfactory explanation of his possession.

Pacelli did not testify at the trial.[5] He first claims that this charge was an adverse comment on his failure to take the stand, depriving him of his Fifth Amendment rights not to be compelled to be a witness against himself and of due process. Pacelli also argues that the charge created a presumption against him because he did not take the stand and thereby violated 18 U.S.C. § 3481.[6] Appellant relies heavily on the recent Supreme Court decision in United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). That case dealt with a provision in the Internal Revenue Code, which the Court recognized as similar to section 174. United States v. Gainey, supra at 64–65 n. 2, 85 S.Ct. 754. The Code provides that the presence of a defendant at a site where the business of a distiller is being carried on unlawfully is sufficient to authorize conviction "unless the defendant explains such presence to the satisfaction of the jury." Int.Rev.Code of 1954, § 5601(b) (2). In affirming the conviction of defendant Gainey, the Court upheld a charge similar to that given by Judge Bonsal and specifically rejected the contention that the charge could "be fairly understood as a comment on the petitioner's failure to testify." United States v. Gainey, supra at 70–71, 85 S.Ct. at 759. Similarly, in United States v. Secondino, 347 F.2d 725 (2d Cir.), cert. denied, Massari v. United States, 382 U.S. 931, 86 S.Ct. 322, 15 L.Ed.2d 342 (1965), this court relying on *Gainey* reached a similar conclusion with respect to section 174. See also United States v. Christmann, 298 F.2d 651, 652–653 (2d Cir. 1962) (dictum); Williams v. United States, 328 F.2d 256, 262 (8th Cir.), cert. denied, 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964).

Pacelli seeks support not from the holding of *Gainey*, but from its advice that "the better practice would be to instruct the jurors that they may draw the inference unless the evidence in the case provides a satisfactory explanation for the defendant's presence at the still, omitting any explicit reference to the statute itself in the charge." 380 U.S. at 71 n. 7, 85 S.Ct. at 759. We agree that this would be the better practice and suggest it be followed in the future. But the holding of *Gainey* is that mention of the statute does not require reversal so long as there is "neither allusion nor innuendo based on the defendant's decision not to take the stand." Id. at 71, 85 S.Ct. at 759. Defendant counters that Judge Bonsal, unlike the trial judge in *Gainey*, failed in this command because he did not make it clear that a defendant was not required personally to testify and that the "explanation" could come from other evidence in the case. Pacelli urges with some force that the government's own request for charge would have told the jury that the explanation could have come from "the evidence in the case." However, Judge Bonsal did charge later in his instructions, after noting that certain defendants had testified, that:

The other defendants did not testify and you will not consider this as any evidence whatsoever against them or as any basis of any presumption or inference unfavorable to them. You will not permit this to weigh in the slightest degree against any of the defendants who did not testify nor

---

5. Neither did appellant Armone.

6. In trial of all persons charged with the commission of offenses against the United States and in all proceedings in courts martial and courts of inquiry in any State, District, Possession or Territory, the person charged shall, at his own request, be a competent witness. His failure to make such request shall not create any presumption against him.

should this matter enter into your deliberations. This is because the government must prove a defendant guilty beyond a reasonable doubt, a defendant is not required to prove his innocence.

Somewhat earlier he had charged:

Now, I mention these two defendants purely by way of example and for nothing else, because you will review the evidence and consider what reasonable inferences you find may be drawn therefrom with respect to each of the six defendants. As I said, it is for your determination what reasonable inferences may be drawn from the evidence. But I remind you again that after considering all of the evidence as to a particular defendant you find that two reasonable inferences may be drawn, one consistent with his innocence and one consistent with his guilt, you must acquit the defendant * * *.

It would be hypertechnical, in the face of these instructions, to convert a general and accurate explanation of the section 174 permissible inference into a comment on defendants' failure to take the stand.[7] Nor do we find any merit in Pacelli's final argument that Judge Bonsal's explanation of the permissible inference in section 174 rendered the inference conclusive because the judge did not sufficiently explain the meaning of the word "inference."

*Allegedly prejudicial publicity*

Appellant Pacelli next contends that publicity destroyed his right to a fair trial by an impartial jury as guaranteed by the Sixth Amendment, Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and, in federal trials, buttressed by the supervisory power, see Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). The errors specifically claimed are denials of motions for a change of venue, a continuance, a mistrial, and an examination of the persons responsible for the publications here involved.

Pacelli was indicted on September 30, 1964. On January 11, 1965, the front page of a New York City newspaper with a large circulation featured a photograph of a young woman in what appears to be lingerie, and the banner headline FEAR MOB SLEW DOPE BIG'S GIRL. Bold face type over the caption asked Was She Killed To Seal Her Lips?[8] On page three appeared a banner headline and a sub-headline: Fear Dope Big's Girl Was Rubbed Out [and] Dancer Talked to Grand Jury And Promptly Vanished. There was another eye-catching picture of the young lady.[9] On Jan-

---

7. In the portion of the charge dealing with the statutory inference, it would again be wiser practice to state also that the "explanation" can come from any evidence in the case and that the total evidence should be considered.

8. The caption stated, in part:
Nancy Sue Shelton * * * is missing. Federal authorities fear she may have been murdered because she knew too much—too much about some of the unsavory characters she was known to have associated with. Nancy disappeared three months ago * * * after testifying before a grand jury looking into dope smuggling. Her boyfriend, Vince Pacelli, who trafficked in narcotics, was under surveillance at the time of her disappearance. * * * Story on page 3

9. The story said, in part:
But Nancy Sue hasn't been seen for more than three months now, and the feds believe she is dead. Murdered— because she knew too much.
\* \* \* \* \*
She was Vince Pacelli's girl, and Vince was a man who played it tough in the international dope traffic.
200 Million Dope Ring
Federal narcotics agents said that Pacelli was a member of a ring which smuggled more than $200 million worth of dope into the U. S. over a five-year period, even using Mauricio Rosal * * * as a courier. Rosal is doing a 15-year stretch.
On Sept. 23, agents had Pacelli under surveillance at Lexington Ave. and 73d St. when Nancy Sue drove up in a taxi.
Pacelli, 43, of 422 E. 118th St., paid her fare and helped her out of the cab. The couple strolled on 73d St. to Third

uary 12, another article on the subject appeared in the same newspaper under a prominent headline (Dope Mob Ordered Nancy Sue to Scram) on page five. Both stories identified Pacelli as the missing girl's boy friend "who trafficked in narcotics."

Pacelli also points to a magazine article published approximately mid-way through the trial. The article appeared in a semi-scientific magazine addressed to laymen, with a national circulation of one and one-third million copies. Its contents are divided into departments, of which "Cars and Driving," "Home and Shop," and "TV, Radio and Electronics" are representative. In the June 1965 issue (apparently published about June 1), there appeared a six-page article, not referred to on the cover, but listed in the inside table of contents under "Special Reports." The article began mid-way through the issue, and was entitled "Our top anti-narcotics agent tells the inside story of how three nations combined to fight [the following in large type] The Dope-Smuggling Diplomats." The article is by-lined "by Henry L. Giordano as told to James C. G. Conniff." Mr. Giordano is identified under his photograph as Commissioner of the United States Bureau of Narcotics. The article describes the smashing of a narcotics smuggling ring which utilized diplomats as couriers, and is written in a popular, although unsensational, style. It identifies and has photographs of seven co-conspirators who were named in the indictment in the instant case, including one witness at the trial, and also names defendant Cahill (who was severed). The article did not mention any defendant tried below. On the day of publication, motions for a mistrial were made based on the article.

The motions were denied, as was a later motion to vacate the verdict which was based in part on allegedly prejudicial publicity.

Since argument of this case, the Supreme Court has handed down its opinion in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In considering the question of prejudicial publicity here raised, we have carefully read the *Sheppard* case and take as our governing standard the following (id. at 362 of 384 U.S., at 1522 of 86 S.Ct.):

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances.

In *Sheppard,* the barrage of publicity reached carnival proportions, the jurors were "without adequate directions not to read or listen to anything concerning the case," there was no doubt that "this deluge of publicity reached at least some of the jury," "bedlam reigned at the courthouse," and the arrangements between the court and news media "caused Sheppard to be deprived of that 'judicial serenity and calm to which [he] was entitled.'" The Supreme Court stated that the basic reason for vacating the conviction was that the trial judge "did not fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the

Ave. There, the agents took Pacelli into custody on a narcotics charge.

\* \* \* \* \*

[Nancy Sue failed to return before the Grand Jury to finish her testimony shortly thereafter, the story continues.]

The day after Nancy Sue testified the feds caught up with a longtime fugitive \* \* \* a business associate of Pacelli.

The authorities said the underworld assumed Nancy Sue talked and that others might be nabbed if she talked some more.

\* \* \* \* \*

If by remote chance you see her, let the government know. Your anonymity will be protected.

courtroom." Id. at 363 of 384 U.S., at 1522 of 86 S.Ct.

None of these conditions can fairly be found in this case. There was no barrage of publicity. Complaint is made only of the publications described above. The two newspaper articles appeared on successive days in January, sixteen weeks before trial. Thereafter, until the June 1 magazine article, apparently nothing was written or said in the news media which would cause defendants to complain. A good part of this is undoubtedly due to the commendable foresight of the trial judge. A month before the trial, he asked the United States Attorney (with the concurrence of defense counsel) to request local news media not to publicize the trial. See United States v. Bentvena, 319 F.2d 916, 934 (2d Cir.), cert. denied, Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). The jurors were adequately and periodically warned not to read or listen to any accounts of the case in the media, and, in conducting the voir dire about the publications, the judge carefully walked the tightrope between exploring the jurors' knowledge and titillating their curiosity about material previously unknown to them.

Finally, we cannot fairly say, as the Court did in *Sheppard,* that there is no doubt that the publicity reached "at least some of the jury." [10] As to the magazine article published during the trial, the court below promptly inquired of the jury as follows:

> Before we adjourn for the day I would just like to tell you, you remember, I had been mentioning to you every day about any possible articles, radio or TV programs. My attention has been called to a recent article in a magazine of national circulation, not one of the really popular ones that you know, but still a magazine of national circulation, which mentions the name of people who have testified at this trial and mentions some of the names of other

people you and I have heard in the course of the trial. And since that has been brought to my attention, I would just like to ask each of you whether you have seen that article?

> Well, now, if you should see it or if anyone should call it to your attention, I would be very grateful if you will not read it, but come and tell me about it, don't tell your fellow jurors. Please do not read it, but come to me and I will talk to you about it.

We see no reason to disbelieve the jurors' negative response regarding an article which had just been published in a magazine of somewhat limited appeal. As to the newspaper articles published before trial, at the beginning of the trial the court conducted a detailed voir dire which included the newspaper reading habits of the prospective jurors. The judge asked all members of the panel to advise him if they had read or heard anything about narcotics in general which would interfere with their ability to render a fair and impartial verdict, and if they had read anything in the press or heard anything relating to the defendants on trial, and received negative responses. Eight of the jurors finally selected were asked which newspapers they read; two said they read the newspaper involved, and one said he read "most of them." Each juror was asked whether he knew of any reason preventing him from rendering a fair verdict, with a negative response in all cases. No objection appears to have been taken after the voir dire regarding the failure specifically to ask four of the jurors which newspapers they read. The newspaper articles appeared some sixteen weeks before trial. We regard this time lag between publication and trial as most significant. As we recently had occasion to say:

> [T]he situation here is in no way comparable to that in Marshall v. United States, supra, where the Court reversed a conviction for unlawfully dis-

---

10. All jurors but one had read about the case in the newspapers or heard broadcasts about it. 384 U.S. at 345, 86 S.Ct. at 1519.

pensing drugs where it was shown that seven jurors had been exposed to news articles which disclosed the defendant's prior criminal record and other information after the same material had been excluded from the trial by the trial judge. By direct contrast, the adverse publicity in the present case appeared several months prior to the trial and the importance of this time-lag cannot be overlooked. Both the Supreme Court and this court have indicated that the length of time between the publication of adverse publicity and the empanelling of the jury is a significant factor in assessing claims of prejudice resulting from pretrial publicity. See Beck v. Washington, 369 U.S. 541, 556–558, 82 S.Ct. 955, 8 L.Ed.2d 98 (1961); Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952) (six weeks); United States ex rel. Brown v. Smith, 306 F.2d 596, 603 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963) (three months). Since the articles involved here were twelve weeks old at the time the jury was empanelled, it is highly unlikely that they were retained in the memories of the jurors. As Judge Weinfeld has pointed out, it is a fact that "frequently in this large metropolitan district prospective jurors show little recall of past widely publicized matters * * *." United States v. Kahaner, 204 F.Supp. 921, 924 (S.D.N.Y.1962).

United States v. Bowe, 360 F.2d 1, 11 (2d Cir. 1966).

■■ Whether publicity is so prejudicial as to require a new trial is ordinarily committed to the trial judge's discretion. "Generalizations beyond that statement are not profitable, because each case must turn on its special facts." Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173 (1959). Under all of the circumstances of this case, including the time of the publicity, the steps taken by the trial judge to curb its effect on jurors, his careful exploration of its impact and the response of the

jurors, we do not feel that the court below committed error. We do not believe a contrary result is required either by *Sheppard* or the cases cited in Pacelli's brief. We have already discussed the former; as to the latter, Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639 (1961), involved a trial which "had become the *cause celebre*" of a small community. Eight of the twelve jurors selected thought petitioner was guilty in advance of trial. In Marshall v. United States, supra, several jurors read, during the trial, articles disclosing other crimes by petitioner. Here, of course, there is no evidence that jurors had read, much less remembered, the particular articles. Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), was another cause celebre involving a televised trial, and Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), involved a televised confession viewed by several members of the jury. The other authorities cited to us are equally distinguishable.

*Overt act 10*

The next asserted error is the treatment of an overt act, number 10 in the indictment. We note at the outset of discussion of this issue that the narcotics statute here involved contains a conspiracy provision which, unlike the general conspiracy statute, 18 U.S.C. § 371, does not in terms require the doing of "any act to effect the object of the conspiracy." One district court has concluded that an overt act need not be proven under 21 U.S.C. § 174. United States v. Gardner, 202 F.Supp. 256 (N.D.Cal. 1962); cf. Developments in the Law— Criminal Conspiracy, 72 Harv.L.Rev. 920, 948 (1959). As the government does not urge this ground, and as we believe the trial court committed no error in instructing the jury regarding the overt act, we do not think it necessary to explore this issue.

Of the eleven acts alleged in the indictment, only two were submitted to the jury; the trial judge held that the statute of limitations barred consideration of the other nine. The indictment al-

leged as overt act 10 that "in or about March of 1960," Joseph Armone was "in the vicinity of 122 Second Avenue, New York, New York." Thereafter, the government in a bill of particulars specified the act as taking place "during March or April of 1960, approximately between 1:00 P.M., and 5:00 P.M., inside 207 Second Avenue, New York City." 207 Second Avenue was, of course, a different address from that specified in the indictment—122 Second Avenue.

At the trial, there was evidence that in April or May 1960, Hedges had a conversation with Armone in Lulu's Bar (conceded here to be located at 207 Second Avenue) during which Hedges complained about the amount of his payments. There was also testimony of a conversation between the same persons at the same place and some time in the same months concerning a counterfeit $100 bill passed by Godwin, Hedges's cousin and one of the co-conspirators. Hedges testified that in Lulu's Bar Joseph Armone told him that a counterfeit $100 bill given "them" by Godwin would cause trouble in the form of an investigation. Godwin gave testimony corroborating this conversation.

During his charge, Judge Bonsal read the allegation of overt act 10 in the indictment and stated:

As I recall the evidence here—and I say it is your recollection that controls, and not mine—overt act number 10 refers to the conversation alleged to have taken place between Joseph Armone, Hedges and Godwin concerning the counterfeit $100 bill. As I recall it, Hedges said that Joseph Armone was concerned about the counterfeit bill, concerned about the trouble that it would cause.

After some deliberation, the jury requested that the testimony relating to overt acts 10 and 11 be read to them. Thereafter, pursuant to agreement of the parties, the judge read to the jury in connection with act 10 the testimony of the conversation at Lulu's Bar concerning the counterfeit bill. As already noted, it is conceded here that Lulu's Bar is at 207 Second Avenue. The judge also again read the allegations of the indictment regarding act 10. It will be recalled that this referred to Armone's being in the vicinity of 122 Second Avenue. More deliberation followed, and then the following note came from the jury:

Judge Bonsal count 10 states that Joe Armone was in the vicinity of 122 Second Avenue during March, 1960.

When the request was made this afternoon to rehear count 10 testimony, we re-heard-testimony that occurred at Lulu's Bar and the lunch counter across the street from Lulu's.

These two locations are five blocks (approximately) apart.

Can these [scratched out]

[over]

Can 122 2 Ave. be thought of as "the vicinity" or is 122 a different [scratched out] the location of another, separate event?

Respectfully,
C. Burquist

The court thereupon told the jury that "everything you say here is exactly the truth" and that it was for them to determine whether 122 Second Avenue is in "the vicinity of" Lulu's Bar and the restaurant across the street. The jury was told to use its common sense. At no point did any defendant claim that the testimony concerning counterfeit money did not bear on overt act 10 or object on the ground that overt act 10 was in fact something different. In fact, as indicated above, defense counsel cooperated in selecting the testimony to be read to the jury.

A few weeks after the verdict, the trial judge summoned counsel to tell them he had learned that there had been no testimony relating to the conversation about the counterfeit bill before the Grand Jury. The judge believed that the Grand Jury in alleging overt act 10 had apparently intended the conversation in which Hedges asked for higher payments (that conversation also took place at Lulu's Bar at 207 Second Avenue). The

judge thought it was "a mistake in which we all participated."

From this relatively simple set of circumstances and a trial judge's effort to bend over backwards to be fair, defendants have spawned a bewildering array of contentions, some of them inconsistent with each other. Pacelli's will be considered first. He first argues that the jurors' note meant to ask whether the "vicinity" of 122 Second Avenue can be said to include 122 Second Avenue itself. His theory is that the jury, having heard still other evidence concerning events at that address,[11] and not knowing of the bill of particulars specifying 207 Second Avenue, thought that perhaps 122 Second Avenue could not be deemed (in law) to be in the vicinity of itself, and wanted to know. If this interpretation is correct, Pacelli continues, the judge's response could only be confusing because it focussed on a conversation at 207 Second Avenue. We think that this interpretation of the jury note —which was never raised below—does not rise to the level of "strained." The note explicitly refers to "two locations," including Lulu's Bar (which is at 207 Second Avenue), and their distance apart, and asks whether 122 can be thought of as "the vicinity," or whether it is the location of a different event. The note could only be interpreted reasonably as asking for the definition of "vicinity" vis-a-vis the two locations. If anything, by eliminating the possibility raised by Pacelli that the jury might tie up overt act 10 to other testimony of events at 122 Second Avenue, the trial judge helped, rather than harmed, defendants. Appellant argues that the possibility of confusion remained, thereby vitiating the verdict. However, the jury's note makes clear that it was following the testimony closely and was focussing sharply on the limited issue the trial judge had left with it.

Pacelli also claims he was deprived of a unanimous verdict because

jurors might agree that act 10 was proven for different reaons; i. e., some might consider events at 122 Second Avenue, while others might find the conversation at 207 Second Avenue occurred. Armone and Grammauta similarly argue that the court refused to charge that the jury had to agree unanimously on one or the other of the overt acts submitted to it, and not merely agree that an overt act had been proven. Whether this fragmentation of the unanimity requirement is impermissible need not be explored. As for Pacelli's claim, the judge's reply to the note in effect eliminated this possibility from the case. As for Armone and Grammauta's argument, the court's charge that "your task will be to find beyond a reasonable doubt that at least one of the overt acts 10 and 11, in fact, took place * * *. Now, if you find beyond a reasonable doubt that at least one of these two overt acts, 10 and 11, was committed," coupled with his instruction that the verdict be unanimous, adequately answers this objection. "You" and "your" obviously refer to the jury as a body; any supposition that the jurors would take the instructions to mean that they can fragment their findings on the elements of the offense (taking overt acts *arguendo* to be "elements" in this context) is strained conjecture.

Accepting the correct interpretation of the jury note *arguendo*, Pacelli next contends that there was no evidence of the distance between 122 and 207 Second Avenue, and the subject was not one that the jury could notice; hence, the jury either guessed at the distance or took a view, both of which courses are impermissible. Therefore, there was no way the jury could decide vicinity *vel non*, and the issue as to act 10 should not have gone to the trier of fact. This argument was again not made to the trial judge at any time and for that reason, among others, cannot prevail here. In fact, appellants did not object to the court's endorsement of the jury's sup-

---

11. There was testimony, not referred to above, that the Amvets Club at 122 Second Avenue was the scene of many events referred to in the evidence.

position as to the distance between the two places by telling it "everything you say here is exactly the truth."[12] In addition, there was sufficient evidence from which the jury could approximate the distance between the Amvets Club and Lulu's Bar as five blocks.[13]

■■■■■ The other appellants apparently argue that as a matter of law 207 and 122 Second Avenue could not be in the same "vicinity" and therefore the issue should not have been submitted to the jury. This position is incorrect. Moreover, any error committed by the trial judge did not harm defendants. The sequence of events shows that there was here nothing more than an immaterial variance between the indictment and the proof—the indictment charging 122 Second Avenue and the proof showing 207 Second Avenue—and appellants were aware of the variance over six weeks before the trial began. See United States v. Ansani, 240 F.2d 216, 223 (7th Cir.), cert. denied, Milner v. United States, 353 U.S. 936 (1957) (variance between Chicago and Cicero, Illinois, held immaterial); Strauss v. United States, 311 F.2d 926, 932 (5th Cir.), cert. denied, 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963); United States v. Glaze, 313 F.2d 757 (2d Cir. 1963). Therefore, the judge could have instructed the jury that the proof of act 10 did not specifically conform to the charge in the indictment but that the variance was immaterial. He could have gone on to say that if the jury believed that the conversation about the counterfeit bill took place at 207 Second Avenue in March or April of 1960, the prosecution had fulfilled its burden as to act 10.[14] Therefore, the judge created an additional issue of fact in his instruction that the jury consider whether 122 and 207 Second Avenue were in the same vicinity, and any error was not only harmless, but was beneficial to appellants. Pacelli also argues that the jury should have been instructed that different non-adjacent addresses are not in the "vicinity" of each other. "Vicinity" has been defined as "a surrounding area or district." Webster's Third New International Dictionary 2550 (1961). No one seriously contends that the jury had an erroneous idea of the approximate distances involved. Its note asserted that the distance was "five blocks (approximately)" and even appellant Pacelli's brief says no more than it is "closer to six blocks apart and on opposite sides of the street."

Appellants have three further major thrusts based on overt act 10: (1) the

---

12. Appellants did urge the judge to take the entire issue from the jury as a matter of law.

13. Despite the statement in Appellant Pacelli's Brief, p. 67, that "a search of the transcript reveals that *no testimony was presented from which the jurors might infer the distance between these two addresses*" (emphasis in original), there is at least the following in the record: Hedges testified that the address of the Amvets Club was 122 Second Avenue. Joint Appendix ("JA"), pp. 84a, 90a, 94a, 156a. He also testified that Lulu's Bar was at 13 Street and Second Avenue. Id. at 157a. Godwin testified that the bar was on 12 Street and Second Avenue. Id. at 220a. Sol Gold testified that he lived "at Second Avenue and 4th Street, 65." Record, p. 3600. Aspelund testified that the Phoenix Bar was on Second Avenue, between 12 and 14 Streets, JA, p. 197a, and on cross-examination stated it was between 10 and 12 Streets. Record, p. 1812.

When asked "you gave the address [of the Phoenix Bar] 180 Second Avenue," Aspelund replied "I got it in France" (although he later professed not to have paid attention to the address at the time in question). Id. at 1812–1818.

Knowing that 65 Second Avenue was at 4 Street and that 180 Second Avenue was between 10 and 14 Streets, the jury could reason that, in the area of Second Avenue in question, there were about 10 or 20 house numbers per block. This would locate the Amvets Club between about 6 and 12 Streets, or up to seven blocks from Lulu's Bar. Depending on what testimony as to various addresses was believed, the jury could easily have placed the distance between the club and the bar at "five blocks (approximately)," which is what it did.

14. Subject, of course, to the requirement that the act be in furtherance of the conspiracy, discussed *infra*.

absence of any Grand Jury testimony about the counterfeit bill conversation was fatal error; (2) the conversation, in any event, was not an act in furtherance of the conspiracy; and (3) reception of the evidence violated the "other crimes" rule.

The first point is based on the premise that the failure of the Grand Jury to consider what developed at the trial as act 10 precludes consideration of the act by the petit jury. In United States v. Negro, 164 F.2d 168 (2d Cir. 1947), appellants were convicted for a narcotics conspiracy. There was no evidence of the only overt act alleged in the indictment, but the government argued that another overt act had been proved. This court reversed for lack of evidence of the overt act alleged in the indictment because the trial judge had instructed the jury only as to this act and had not instructed the jury as to the proven (but unalleged) act. To avoid a problem at the impending retrial, the court considered the question of proving unalleged acts (id. at 173):

> We believe that, at least for some purposes, the overt act is not part of the crime. * * * Thus if, in the instant case, there had been no proof of any overt act other than that alleged, and if the defendant Bruchon had been acquitted, we think that, under the doctrine of double jeopardy, he could not subsequently have been convicted for a conspiracy on the same facts with the single exception that, in the second trial, a different overt act was alleged and proved. We think, also, that an overt act is not part of the crime in the sense that the act alleged must be proved, where another unalleged overt act is proved. * *

> Consequently, we think the substitution of proof of an unalleged for an alleged overt act does not constitute a fatal variance. At most, such a vari-

ance justifies a request for continuance because of surprise.

Appellant Pacelli asks this court to disavow this dictum. Contrariwise, appellants Armone, Grammauta and Viscardi argue that the *Negro* case requires reversal here. The latter contention is clearly erroneous since, under *Negro*, a conviction may rest on an overt act not charged in the indictment. As to Pacelli's frontal attack on *Negro*, the rule of that case has also been accepted by three other courts of appeals, Napolitano v. United States, 340 F.2d 313, 314 (1st Cir. 1965); Culp v. United States, 131 F.2d 93, 100 (8th Cir. 1942); Worthington v. United States, 1 F.2d 154, 155 (7th Cir.), cert. denied, 266 U.S. 626, 45 S.Ct. 125, 69 L.Ed. 475 (1924), although there is authority to the contrary, Fredericks v. United States, 292 Fed. 856 (9th Cir. 1923), and we see no reason not to adhere to the rule in this circuit.[15] Moreover, the essence of the charge against appellants is a criminal agreement. A principal reason for the overt act requirement in a conspiracy prosecution "is simply to manifest 'that the conspiracy is at work,' Carlson v. United States, 187 F.2d 366, 370, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence." Yates v. United States, 354 U.S. 298, 334, 77 S.Ct. 1064, 1085, 1 L.Ed.2d 1356 (1957).[16] Where, as here, the unalleged overt act dealing with the counterfeit bill was inadvertently substituted for the alleged overt act dealing with conversation about commissions, defense counsel joined in focussing the jury's attention on testimony as to the former, no objection was made to the trial judge raising this issue, a fortiori no continuance was sought, and there was ample testimony as to the overt act referred to by the trial judge, reversal for the reasons urged by appellants is unwarranted.

15. For favorable law review comment on the rule, see Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 992–993 (1959).

16. See Developments, supra note 15, at 945–949 (other rationales for overt act requirement).

As to the second contention, an overt act is an act "committed in pursuance of the agreement." United States v. Agueci, 310 F.2d 817, 828, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Appellants seem to argue that conversation cannot be an "act," and that, in any event, this conversation was not in furtherance of the conspiracy. However, much talk is "action" with direct legal consequences; e. g., people "decide," "promise," and "reject." Cf. decisions holding telephone conversations to be overt acts, Singer v. United States, 208 F.2d 477, 480 (6th Cir. 1953); Bartoli v. United States, 192 F.2d 130, 132 (4th Cir. 1951); Smith v. United States, 92 F.2d 460, 461 (9th Cir. 1937). Here we have a warning to co-conspirator Hedges by defendant Armone, after the conspirators had gone to the trouble of tracing the source of the counterfeit bill. We hold that this conversation qualified as an "act." Moreover, the jury could find that Armone was attempting to stave off investigation of the conspiracy by warning Hedges of the dangers of passing counterfeit money among the conspirators. The trial court left the issue of furtherance to the jury. We cannot say as a matter of law that the jury could not reasonably have concluded that this conversation, viewed in the context of the other evidence, was in furtherance of the conspiracy. Reliance on Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), is misplaced, for there the Court stated (id. at 405, 77 S.Ct. at 974):

> By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

In the present case, the objectives of the conspiracy—importation and distribution of narcotics—had not been completed at the time of the conversation. And we cannot say that the successful accomplishment of the crime did not necessitate concealment. Cf. Mount v. United States, 333 F.2d 39, 44 (5th Cir.), cert. denied, 379 U.S. 900, 85 S.Ct. 188, 13 L.Ed.2d 175 (1964); Atkins v. United States, 307 F.2d 937, 940 (9th Cir. 1962).

Finally, Armone and Grammauta argue that the reception of evidence pertaining to the counterfeit bill, and evidence relating to what may have been a different counterfeit bill (won in a dice game by Armone's nephew and given to Armone's sister-in-law), violated the rule excluding proof of other crimes. But Armone himself was not shown to have passed or received counterfeit money knowingly and voluntarily; moreover, his relatives were not shown to have been knowingly connected with the counterfeit money either. This argument is without merit.

## II. ARMONE AND GRAMMAUTA
### Hedges's testimony

Defendants Joseph Armone and Stephen Grammauta raise nine separate grounds, in addition to those already discussed, for reversing the jury verdict. Four of them have to do, in whole or in part, with the testimony of Charles Hedges, the chief witness for the prosecution. Thus, these appellants attack the adequacy of the trial court's instruction under United States v. De Sisto, 329 F.2d 929 (2d Cir.); cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), which held that in certain circumstances prior sworn testimony of a witness could be admitted as substantive evidence, rather than for impeachment only. Hedges had previously been prosecuted in Connecticut, see United States v. Cianchetti, 315 F.2d 584 (2d Cir. 1963), and had given testimony contrary to his testimony in this trial. The court below charged that the jury could consider the prior testimony in weighing credibility, and could also consider it as

affirmative evidence in this trial. An objection below to the instruction (apparently not made by these two appellants) related to the possibility that both the earlier and current testimony could be false. The trial court thereupon charged:

> Secondly, you remember I talked about Hedges' testimony at the Connecticut trial and I told you it is for you to judge on which occasion he was telling the truth. But, of course, it is equally within your province to find he was testifying falsely on both occasions. You can do that. You can find that or you can determine on which occasion he was telling the truth and in which part of his testimony he was telling the truth.

These instructions were clear and correct.

■ Armone and Grammauta next claim that cross-examination of Hedges was unduly limited. We have examined the specific instances cited and find no abuse of discretion in the limitation of this five and one-half day cross-examination. These appellants next contend that the federal rule allowing conviction on uncorroborated testimony of accomplices is not one of unvarying application, that it is the "better practice" to require corroboration and that the circumstances of this case call for the better practice. But a short time ago, this court stated:

> We cannot understand why they insist that the testimony of accomplices must be corroborated. The federal rule is clearly to the contrary. [citations]

United States v. Kelly, 349 F.2d 720, 767 (2d Cir. 1965). Appellants also suggest we hold the accomplice testimony in this case incredible as a matter of law. The argument is completely without merit. United States v. Aviles, 274 F.2d 179, 190 (2d Cir.), cert. denied, 362 U.S. 974, 982, 80 S.Ct. 1057, 1068, 4 L.Ed.2d 1009, 1015 (1960).

*Denial of continuance to Armone*

Appellant Armone next contends that the court erroneously denied his motions for severance on account of illness during the trial. Armone had been shot in the chest some sixteen months before the trial started, but, according to his brief, still suffered at trial from a "pancreatic abscess which required external drainage through an abdominal incision that had to be kept open as it would heal over from time to time and produce a backing up of pus which caused a severe toxic condition." Trial commenced on May 3, 1965, and the first mention thereafter of Armone's condition to the court was on May 19, when the trial judge, after being informed of a jury tampering incident, remanded all defendants. Thereafter, the judge allowed Armone to be treated by his personal physician on two occasions. On Tuesday, June 8, the trial was adjourned so that Armone could be taken to the hospital where he was examined by a government physician. The following day counsel moved for a severance, but a few hours of trial were held in the afternoon. The court stated that it would observe defendant. On June 10, the court was informed that Armone was being detained in the hospital, and two adjournments followed until Monday, June 14. That day and the next, counsel again objected to proceeding with trial, but the trial continued. Both sides rested on Tuesday, June 15, and after another day's adjournment final arguments started on Thursday, June 17. On the afternoon of June 15, the court took testimony from Armone and two physicians on the issue of competence to stand trial; the court also heard defendant again and another doctor on June 17, and a fourth doctor on July 9, the latter date falling after conclusion of the trial.[17]

---

17. Since the judge had denied the motions before the trial ended, we have considered the record as it was before him then. It should be noted, however, that not infrequently competence to stand trial is determined after the fact or *nunc pro tunc.* E. g., United States v. Tom, 340 F.2d 127 (2d Cir. 1965) (per curiam); Johnston v. United States, 292 F.2d 51 (10th Cir.), cert. denied, 368 U.S. 906, 82 S.Ct. 186,

The determination of competence to stand trial is, of course, basically a question of fact and, as with appellate review of most factual issues, the higher court bows to the lower court unless an abuse of discretion is manifest. United States v. Tom, 340 F.2d 127 (2d Cir. 1965); United States v. Shotwell Mfg. Co., 287 F.2d 667, 672 (7th Cir. 1961), aff'd on other grounds, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Stein v. United States, 263 F.2d 579, 581–582 (9th Cir. 1959); United States v. Alker, 260 F.2d 135, 157 (3d Cir. 1958), cert. denied, 359 U.S. 906, 79 S.Ct. 579, 3 L.Ed.2d 571 (1959). Here at most there was a conflict of testimony, which the trial judge was in the better position to resolve. Despite Armone's testimony to the contrary, there was sufficient medical testimony to establish Armone's competence to stand trial during the period under attack. In the light of this evidence and the trial judge's grant of adjournments, we cannot say that he was clearly in error and abused his discretion.

*Alleged other crimes testimony and guilt by association*

Appellants Armone and Grammauta also claim that they were denied a fair trial by proof of other crimes or a propensity to commit them. Beside the counterfeit bill incidents, dealt with supra, they point to two answers given by Hedges on cross-examination. In one, responding to a question about an offer of a job, Hedges said that Joseph Cahill (a severed defendant) proposed that Hedges rob a bookmaker for "some defendants." The judge promptly instructed the jury to disregard this answer. The other answer came about as follows:

> Q. Did you testify at the Connecticut trial that you went down and brought Mr. Aspelund into the hotel?
>
> A. If I did your defendants would be up there—

After immediate objection the question was rephrased and a different answer given. We think that these two brief, isolated outbursts, at most ambiguous, unavoidable when dealing with witnesses of Hedges's admitted background, coming out on cross-examination by the defense, and with no prosecutorial intent to improperly prejudice defendants, were patently harmless when considered in conjunction with the curative steps taken.

In the same vein, appellants also claim that admission into evidence of a nightclub photograph showing some defendants seated together and a telephone number book containing the names of several defendants was reversible error because they improperly created an impression of guilt by association. However, the prosecutor's summation included the following:

> The government is not trying to prove guilt by association, but isn't it some evidence of the conspiracy, that these people knew each other and that these people went out with each other?
>
> \* \* \* \* \* \*
>
> Once again, ladies and gentlemen, I am not talking about guilt by association, I am just talking about these people knowing each other and associating with each other as some evidence.

At this point, the court told the jury "you can't find guilt by association" and that it had to "consider all the evidence as to the association." Thereafter, in his charge, the judge also said:

> Now, of course, you should not infer membership in a conspiracy merely because of family relationship, merely because some of the defendants may have had their pictures taken together, merely because of friendship between alleged co-conspirators. Of course, you can't find any defendant guilty merely by association.

Since agreement is an element of conspiracy, evidence of association is rele-

7 L.Ed.2d 100 (1961); Wells v. United States, 99 U.S.App.D.C. 310, 239 F.2d 931

(1956) (per curiam); see 18 U.S.C. § 4245.

vant. The judge properly charged the jury on how to handle the issue.

 Since the photograph and telephone-and-address book had been seized incident to or after the arrest of co-defendant Cahill, appellants also claim that they were admissions of a co-conspirator made after his arrest and hence were inadmissible against them. But the evidence involved here was not offered under the admission exception to the hearsay rule to assert the truth of matter contained in an out-of-court statement. A photograph is not an out-of-court statement at all; both items of evidence, moreover, were in existence before the end of the conspiracy. A similar objection to the admission of ten to twelve kilos of heroin is also without merit.

*Single or multiple conspiracies*

 Armone and Grammauta next contend that the evidence showed multiple conspiracies and thus prejudicially varied from the single conspiracy charged in the indictment; implicit in this argument is an alleged insufficiency of evidence linking them to a single conspiracy. They also assert that, in any event, the instructions were not adequate and the verdict was mistaken on this point. Arguing variance, appellants rely essentially on facts disclosed in United States v. Cianchetti, supra, in which Hedges was a defendant and, it is claimed, the present defendants were not mentioned at trial. But in trial 1 there can be a conspiracy with several defendants, and in trial 2 there can be a different conspiracy with some of the same defendants or co-conspirators, or even the same conspiracy with other, different defendants being tried for the first time, all without fatal multiplicity in any case. The judge's charge adequately distinguished between a single conspiracy and multiple conspiracies. As to any supposed insufficiency of evidence, the spare summary of the record supra (pp. —— ——) shows clear support for the jury's verdict. In any event, there is no indication that any variance rose to suffi-

cient dimensions to be prejudicial. United States v. Agueci, 310 F.2d 817, 827 (2d Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013 (1963). Appellants claim that the court should have guided the jury by marshalling the facts, and should have told the jurors that Armone had to be connected with activities prior to entry of new sources of supply of narcotics, or those activities must be disregarded in determining his guilt. No exception was taken by counsel to the charge on these two grounds, and we do not find "plain error" under Fed.R.Crim.P. 52 (b). Compare United States v. Kahaner, 317 F.2d 459, 479–480 n. 12 (2d Cir.), cert. denied, Corallo v. United States, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963), with United States v. Kelly, 349 F.2d 720, 757 (2d Cir. 1965).

*Missing witness instruction*

Finally, these appellants assign as error the court's missing witness instruction concerning one Andy Dillon. The court said:

> You recall that Godwin testified that he received a counterfeit $100 bill and said that it came from one Andy Dillon. Said Andy Dillon was not called to testify by either the government or the defendants, although I am informed that he was in the courtroom during the course of the trial.
>
> Mr. Dillon could have been called by either side as a witness so that from the failure of either side to call him, you may infer that his testimony might have been unfavorable to either the government or to the defendants. But it is equally within your discretion to draw no inference at all from the failure of the government or of the defendants to call Dillon as a witness.

Appellants point out that Dillon was associated by the evidence with Armone, that the government refused to stipulate and the court refused to allow counsel to tell the jury that Dillon had been subpoenaed by the government, and that the instruction included mention of the fact

that Dillon was sitting in the courtroom during the trial (a fact brought to the court's attention by defense counsel). Counsel, after the charge, requested that the jury be told the government had subpoenaed Dillon and that it should disregard any portion of the charge insofar as it allowed the drawing of an inference against defendants.

 The instruction given by Judge Bonsal was a correct statement of the law, and may be given in the absence of a request. United States v. Llamas, 280 F.2d 392, 393 (2d Cir. 1960). The reference to Dillon's presence, while unnecessary, could not be prejudicial, since it merely indicated the foundation for the instruction. If the court had stated that a witness was available who was not, in fact, available, a different picture might have been presented. In any event, no argument is made that Dillon was not in the courtroom. That the government may have been responsible for Dillon's presence is irrelevant. Appellants are in reality attacking the essence of the missing witness charge, i. e., that the jury can draw an unfavorable inference from failure to put a witness on the stand; a defendant does not have the privilege of keeping the missing witness charge from the jury. Even if the government had not subpoenaed Dillon, the charge could have been given present some showing that he was available, if the other conditions for the charge were fulfilled. Hence, that the government subpoenaed Dillon is irrelevant. Since Dillon was undisputably available for each side, the charge was not erroneous. United States v. Comulada, 340 F.2d 449, 452 (2d Cir.), cert. denied, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965); United States v. D'Angiolillo, 340 F.2d 453, 457 n. 5 (2d Cir.), cert. denied, 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965); cf. United States v. Bergman, 354 F.2d 931, 935 (2d Cir. 1966) (witness equally unavailable to both; no inference should be drawn).

## III. VISCARDI

### Statute of limitations

 In addition to joining in contentions already discussed, appellant Viscardi raises two arguments applicable only to him. First, he attacks the court's charge on the statute of limitations. He argues that the evidence showed that before September 30, 1959 (the earliest date not barred by the statute), he took narcotics from Hedges, and after that time he delivered them to Hedges, and, therefore, the court should have instructed the jury to find "exactly which conspiratorial agreement he had entered into, and that such agreement continued past September 30, 1959." The short answer is that a shift in role, as appellant terms it, would not affect the statute of limitations. The conspiracy's vital elements (members and purposes) remained the same after September 1959, and we cannot say that a different job— at least one with as little difference as that involved here—would entail a different conspiracy vis-a-vis the conspirator involved. United States v. Borelli, 336 F.2d 376, 385 (2d Cir. 1964), cert. denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), is not in point; that case dealt with the shifting objectives of the conspiracy. Viscardi was not tried for making a delivery to or receiving narcotics from Hedges; the charge was conspiring to effectuate much more generalized objectives, and whether he was a deliverer or recipient on any particular occasion would not be determinative of what he had conspired to achieve. It is, therefore, unnecessary to deal with the government's contention that Viscardi's function as "plant man" never did change.

### Multiple representation

Viscardi also claims that he was prejudiced by sharing counsel with the two Armones and Grammauta and that the trial court's failure to apprise him of "the hazards inherent in sharing an attorney with the Armones and Gram-

mauta" was error. The short answer to Viscardi's contention is that almost six months prior to trial, the government requested the court to inquire into the existence of a possible conflict of interest. The following interchange between government counsel and counsel for Viscardi, the two Armones, and Grammauta appears on the record:

> Mr. Jacobs: * * * [Y]our Honor, this case was on on Monday and at that time the government stated it wished Mr. Lewis in court because the situation in this case is a novel situation, Mr. Lewis representing four defendants in a conspiracy case, and I wish the Court to ask Mr. Lewis that if after being in this case now for over a month he knows of any conflict or any reason why he couldn't represent these four defendants.

> The Court: I assume he doesn't or he would have brought it to the attention of the Court.

> Mr. Lewis: That's right; I discussed it with my clients and they have advised me they feel there is no conflict.

Viscardi relies upon Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and Campbell v. United States, 352 F.2d 359 (D.C.Cir. 1965). Nothing in *Glasser* requires the government or the court to take further steps after receiving such an assurance from an officer of the court. In *Campbell,* where a single attorney was retained by two defendants, the court reversed the conviction of one defendant because the trial judge did not inquire in-

to whether the defendants knowingly accepted the risk of sharing defense counsel. We need not now decide how much of the *Campbell* case we accept as law in this circuit. We simply hold that the trial judge's inquiry of counsel as to possible conflict of interest in this case sufficed to protect any rights Viscardi may have had in the matter. The court must be allowed to accept an attorney's representations in matters of this kind, at least absent unusual circumstances. Viscardi argues that his counsel might have devoted more time to him in final argument. Viscardi also points out that he had no previous criminal record, that he was the only defendant to produce a character witness, and that the trial judge received many letters in his behalf recommending leniency in sentence. He contends that his counsel might have suggested that additional character witnesses should testify during the trial, had it not been for the fact that this would have reflected adversely upon Armone and Grammauta, who presented no character witnesses. However, these are not weighty arguments. We can take judicial notice of the fact that many who would touch pen to paper will not stand up to be counted in person under oath and in court. Also, brushing off a co-defendant in summation can be effective strategy.[18] Cf. United States v. Burkeen, 355 F.2d 241 (6th Cir. 1966).

We have considered all contentions made by appellants. Having found no reversible error, we affirm the convictions.

Judgments affirmed.

---

18. It should be noted that defendant Alfred Armone, who was represented by the same counsel and received approximately as much attention in counsel's closing remarks as defendant Viscardi, was acquitted.